**AKIN GUMP STRAUSS HAUER & FELD LLP**
ASHLEY VINSON CRAWFORD (SBN 257246)
STEWART R. GILSON (SBN 325552)
580 California Street, Suite 1500
San Francisco, CA 94104
Telephone:      415.765.9500
Facsimile:      415.765.9501
Email:          avcrawford@akingump.com
                sgilson@akingump.com

**SHUTTS & BOWEN LLP**
Harold E. Patricoff (*pro hac vice pending*)
Aleksey Shtivelman (*pro hac vice pending*)
Isabella Llano (*pro hac vice pending*)
200 S. Biscayne Boulevard, Suite 4100
Miami, Florida, 33131
Telephone:      (305) 358-6300
Email:          hpatricoff@shutts.com
                ashtivelman@shutts.com
                illano@shutts.com

Attorneys for Defendants
Alexander Lopatine, Park Capital
Holdings, LLC, Park Capital
Ventures LLC and HelloBuild, LLC

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FINLINK, INC. d/b/a MBANQ, | CASE NO.  3:21-cv-6396-AGT |
| Plaintiff, | **ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM** |
| v. | |
| ALEXANDER LOPATINE, et. al., | Magistrate Judge Alex G. Tse |
| Defendants/Counterclaim Plaintiffs. | Courtroom A – 15th Floor |
| v. | |
| FINLINK, INC. d/b/a MBANQ, | |
| Counterclaim Defendant | |

Defendants/Counterclaim Plaintiffs, ALEXANDER LOPATINE ("Mr. Lopatine"), PARK CAPITAL HOLDINGS, LLC, ("Holdings"), PARK CAPITAL VENTURES, LLC, ("Ventures")

(collectively, Holdings and Ventures are referred to as "Park Capital"), and HELLOBUILD, LLC ("HelloBuild") (collectively, the "Defendants" or the "Counter-Plaintiffs") by and through their undersigned counsel file their Answer, Affirmative Defenses[1], and Counterclaim to Plaintiff's, FINLINK, INC. d/b/a MBANQ ("Plaintiff" or "Mbanq") Complaint (Doc. 1). In support thereof, Defendants state as follows:

## ANSWER

### I.    NATURE OF CASE

1.    Defendants deny the allegations in paragraph 1 of the Complaint and demand strict proof thereof.

2.    Defendants admit that Mbanq entered into a Stock Purchase Agreement ("SPA") with Park Capital and Mr. Ravnborg, but deny all remaining allegations in paragraph 2 of the Complaint and demand strict proof thereof.

3.    Defendants deny the allegations in paragraph 3 of the Complaint and demand strict proof thereof.

4.    Defendants deny the allegations in paragraph 4 of the Complaint and demand strict proof thereof.

5.    Defendants deny the allegations in paragraph 5 of the Complaint and demand strict proof thereof.

6.    Defendants deny the allegations in paragraph 6 of the Complaint and demand strict proof thereof.

7.    Defendants deny the allegations in paragraph 7 of the Complaint and demand strict proof thereof.

---

[1] In an effort to "secure the just, speedy, and inexpensive determination" of this action, Counter-Plaintiffs are contemporaneously submitting their Notice of Motion and Motion to Dismiss Mbanq's Complaint for failure to state a claim upon which relief may be granted (the "Motion to Dismiss"), together with Counter-Plaintiffs' Answer, Affirmative Defenses, and Counterclaim, in order to avoid delay in this proceeding, pursuant to Rule 1, although no answer or counterclaim is due at this time. *See* Fed. R. Civ. P. 1, 13. Counter-Plaintiffs' make this filing without waiver, and without prejudice to the arguments raised in their Motion to Dismiss, which determination should precede any consideration of the Answer and Affirmative Defenses.

## II.   THE PARTIES

8.   Defendants admit the allegations in paragraph 8 of the Complaint for jurisdictional purposes only.[2]

9.   Defendants admit the allegations in paragraph 9 of the Complaint.

10.   Defendants admit the allegations in paragraph 10 of the Complaint.

11.   Defendants admit the allegations in paragraph 11 of the Complaint.

12.   Defendants admit the allegations in paragraph 12 of the Complaint.

## III.   JURISDICTION AND VENUE

13.   Defendants admit the allegations in paragraph 13 of the Complaint for jurisdictional purposes, but deny that the Plaintiff has set forth any proper claim for relief.

14.   Defendants deny the allegations in paragraph 14 of the Complaint and demand strict proof thereof.

15.   Defendants admit that Defendants initially filed a lawsuit in Florida against Mbanq, which case was dismissed on the basis of personal jurisdiction, and Defendants subsequently contacted Mbanq to ask if it would be amenable to suit in California, but Mbanq's counsel failed to respond in the affirmative. Instead, Mbanq's counsel indicated that such a request would have "no legal effect" and then filed suit in California, apparently for tactical reasons. Defendants deny all remaining allegations in paragraph 15 of the Complaint and demand strict proof thereof.

16.   Defendants admit that venue is proper in this District, for determination of venue only. Defendants deny all remaining allegations in paragraph 16 of the Complaint and demand strict proof thereof.

## IV.   STATEMENT OF FACTS

### Mbanq's Interest in Acquiring A4

17.   Defendants admit that Mbanq is incorporated in the State of Delaware with its headquarters in Healdsburg, California. Defendants submit that Mbanq also has conducted business in

---

[2] Defendants submit that Plaintiff's conduct was sufficient to support jurisdiction in Florida, however, in an effort to avoid unnecessary cost, and any further delay, and to "secure the just, speedy, and inexpensive determination" of this action, Defendants agree to the present jurisdiction and venue before this Court for the resolution of this dispute. *See* Fed. R. Civ. P. 1.

Florida and has entered into the Agreements at issue with Defendants who are located in Florida. Defendants deny all remaining allegations in paragraph 17 of the Complaint and demand strict proof thereof.

18.    Defendants admit the allegations in paragraph 18 of the Complaint.

19.    Defendants admit the allegations in paragraph 19 of the Complaint.

20.    Defendants admit the allegations in paragraph 20 of the Complaint.

**Letter of Intent, Supplemental Agreements, and "Head of Americas Agreement"**

21.    Defendants deny the allegations in paragraph 21 of the Complaint and demand strict proof thereof.

22.    Defendants deny the allegations in paragraph 22 of the Complaint and demand strict proof thereof.

23.    Defendants deny the allegations in paragraph 23 of the Complaint and demand strict proof thereof.

24.    Defendants admit that under the LOI, attached as Exhibit A, Mbanq agreed to pay a set purchase price, together with an issuance of a certain percentage of Mbanq's shares on closing (1.5% of the shares), with a put option for Park Capital to sell the shares back to Mbanq at $6.90 per share 12 months after the LOI. Defendants deny the remaining allegations in paragraph 24 of the Complaint and demand strict proof thereof. The documents speak for themselves in all respects and control for purposes of this Court's consideration.

25.    Defendants deny the allegations in paragraph 25 of the Complaint and demand strict proof thereof.

26.    Defendants deny the allegations in paragraph 26 of the Complaint and demand strict proof thereof.

27.    Defendants deny the allegations in paragraph 27 of the Complaint and demand strict proof thereof. Furthermore, Defendants submit that the documents attached to the Complaint as Exhibit B are not the fully executed copies of the Supplemental Agreements. Fully executed copies of the Promissory Notes are attached to the Defendants' Counterclaim filed concurrently herewith.

28.    Defendants deny the allegations in paragraph 28 of the Complaint. Defendants deny the reference to, and the characterization of, Exhibits C and C-1 attached to the Complaint, and demand strict proof thereof. The documents speak for themselves in all respects and control for purposes of this Court's consideration.

29.    Defendants deny the allegations in paragraph 29 of the Complaint and demand strict proof thereof. Defendants deny the reference to, and the characterization of, Exhibit D attached to the Complaint, and demand strict proof thereof. The documents speak for themselves in all respects and control for purposes of this Court's consideration.

**Stock Purchase Agreement**

30.    Defendants admit that Mr. Lopatine executed the A4 SPA on behalf of Park Capital. Defendants deny all other allegations in paragraph 30 of the Complaint and demand strict proof thereof.

31.    Defendants admit the allegations in paragraph 31 of the Complaint, except that Defendants deny that Exhibit C to the Stock Purchase Agreement lays out the Minimum Viable Product ("MVP") that the A4 product would have. On the contrary, Exhibit C indicates the MVP which *Mbanq* agreed to develop *after* the closing of the transaction for the 100% purchase of A4. *See* Exhibit E to the Complaint at ¶ 4 (3) ("REPRESENTATIONS AND WARRANTIES OF THE COMPANY [MBANQ]").

**Defendants' Wrongful Conduct**

32.    Defendants deny the allegations in paragraph 32 of the Complaint and demand strict proof thereof.

33.    Defendants deny the allegations in paragraph 33 of the Complaint and demand strict proof thereof.

34.    Defendants deny the allegations in paragraph 34 of the Complaint and demand strict proof thereof.

35.    Defendants deny the allegations in paragraph 35 of the Complaint and demand strict proof thereof.

**The Present Dispute**

36.    Defendants admit that they filed a civil complaint against Mbanq in the Circuit Court for the Eleventh Judicial District in and for Miami Dade County, Florida ("State Court Action") and that a copy of the Complaint is attached to as Exhibit F. Defendants deny all other allegations in paragraph 36 of the Complaint and demand strict proof thereof.

37.    Defendants admit the allegations in paragraph 37 of the Complaint.

38.    Defendants admit the allegations in paragraph 38 of the Complaint.

39.    Defendants admit the allegations in paragraph 39 of the Complaint.[3]

## V.    CAUSES OF ACTION

## COUNT I

**Declaratory Judgment That The Letter Of Intent And "Supplemental Agreements" Do Not Constitute A Contract Between the Parties**
**(As to All Defendants)**

40.    Defendants repeat and re-allege each and every allegation contained in paragraphs 1 through 39 above as if fully set forth herein.

41.    Defendants deny the allegations in paragraph 41 of the Complaint and demand strict proof thereof.

42.    Defendants deny the allegations in paragraph 42 of the Complaint and demand strict proof thereof.

43.    Defendants deny the allegations in paragraph 43 of the Complaint and demand strict proof thereof.

## COUNT II

**Declaratory Judgment That Mbanq Did Not Transfer Any Shares of Stock to Defendants Pursuant to the LOI, "Supplemental Agreements," Draft Stock Certificates, Or A4 Stock Purchase Agreement**
**(As to All Defendants)**

44.    Defendants repeat and re-allege each and every allegation contained in paragraphs 1 through 43 above as if fully set forth herein.

45.    Defendants deny the allegations in paragraph 45 of the Complaint and demand strict proof thereof.

---

[3] Defendants had the right to appeal this order, but elected not to do so, in an effort to avoid any further delay of adjudicating the merits of Defendants' claims against Mbanq.

46.     Defendants deny the allegations in paragraph 46 of the Complaint and demand strict proof thereof.

47.     Defendants deny the allegations in paragraph 47 of the Complaint and demand strict proof thereof.

48.     Defendants deny the allegations in paragraph 48 of the Complaint and demand strict proof thereof.

49.     Defendants deny the allegations in paragraph 49 of the Complaint and demand strict proof thereof.

## COUNT III

### Declaratory Judgment That The "Head of Americas Agreement" Does Not Constitute A Contract Between Mbanq and Mr. Lopatine
### (As to All Defendants)

50.     Defendants repeat and re-allege each and every allegation contained in paragraphs 1 through 49 above as if fully set forth herein.

51.     Defendants deny the allegations in paragraph 51 of the Complaint and demand strict proof thereof.

52.     Defendants deny the allegations in paragraph 52 of the Complaint and demand strict proof thereof.

53.     Defendants deny the allegations in paragraph 53 of the Complaint and demand strict proof thereof.

## COUNT IV

### Breach of Contract
### (As to Defendants Alexander Lopatine, Park Capital Holdings, and Park Capital Ventures)

54.     Defendants repeat and re-allege each and every allegation contained in paragraphs 1 through 53 above as if fully set forth herein.

55.     Defendants deny the allegations in paragraph 55 of the Complaint and demand strict proof thereof.

56. Defendants deny the allegations in paragraph 56 of the Complaint and demand strict proof thereof.

57. Defendants deny the allegations in paragraph 57 of the Complaint and demand strict proof thereof.

## COUNT V

### Fraud
### (As to Defendants Alexander Lopatine, Park Capital Holdings, and Park Capital Ventures)

58. Defendants repeat and re-allege each and every allegation contained in paragraphs 1 through 57 above as if fully set forth herein.

59. Defendants deny the allegations in paragraph 59 of the Complaint and demand strict proof thereof.

60. Defendants deny the allegations in paragraph 60 of the Complaint and demand strict proof thereof.

61. Defendants deny the allegations in paragraph 61 of the Complaint and demand strict proof thereof.

62. Defendants deny the allegations in paragraph 62 of the Complaint and demand strict proof thereof.

63. Defendants deny the allegations in paragraph 63 of the Complaint and demand strict proof thereof.

## COUNT VI

### Intentional Misrepresentation
### (As to Defendants Alexander Lopatine, Park Capital Holdings, and Park Capital Ventures)

64. Defendants repeat and re-allege each and every allegation contained in paragraphs 1 through 63 above as if fully set forth herein.

65. Defendants deny the allegations in paragraph 65 of the Complaint and demand strict proof thereof.

66. Defendants deny the allegations in paragraph 66 of the Complaint and demand strict proof thereof.

67. Defendants deny the allegations in paragraph 67 of the Complaint and demand strict proof thereof.

68. Defendants deny the allegations in paragraph 68 of the Complaint and demand strict proof thereof.

69. Defendants deny the allegations in paragraph 69 of the Complaint and demand strict proof thereof.

70. Defendants deny the allegations in paragraph 70 of the Complaint and demand strict proof thereof.

71. Defendants deny the allegations in paragraph 71 of the Complaint and demand strict proof thereof.

## COUNT VII

### Negligent Misrepresentation
**(As to Defendants Alexander Lopatine, Park Capital Holdings, and Park Capital Ventures)**

72. Defendants repeat and re-allege each and every allegation contained in paragraphs 1 through 71 above as if fully set forth herein.

73. Defendants deny the allegations in paragraph 73 of the Complaint and demand strict proof thereof.

74. Defendants deny the allegations in paragraph 74 of the Complaint and demand strict proof thereof.

75. Defendants deny the allegations in paragraph 75 of the Complaint and demand strict proof thereof.

76. Defendants deny the allegations in paragraph 76 of the Complaint and demand strict proof thereof.

77. Defendants deny the allegations in paragraph 77 of the Complaint and demand strict proof thereof.

## COUNT VIII

### Unjust Enrichment
**(As to Alexander Lopatine and Park Capital Ventures)**

78. Defendants repeat and re-allege each and every allegation contained in paragraphs 1 through 77 above as if fully set forth herein.

79. Defendants deny the allegations in paragraph 79 of the Complaint and demand strict proof thereof.

80. Defendants deny the allegations in paragraph 80 of the Complaint and demand strict proof thereof.

81. Defendants deny the allegations in paragraph 81 of the Complaint and demand strict proof thereof.

## COUNT IX

**Unfair Competition – Violation of California Business and Professions Code §17200, et seq. (As to Defendants Alexander Lopatine, Park Capital Holdings, and Park Capital Ventures)**

82. Defendants repeat and re-allege each and every allegation contained in paragraphs 1 through 81 above as if fully set forth herein.

83. Defendants deny the allegations in paragraph 83 of the Complaint and demand strict proof thereof.

84. Defendants deny the allegations in paragraph 84 of the Complaint and demand strict proof thereof.

85. Defendants deny the allegations in paragraph 85 of the Complaint and demand strict proof thereof.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense – Failure to State a Claim

Plaintiff's Complaint fails to state a claim for which relief can be granted. Defendants allege, and specifically incorporate by reference the allegations of Defendants' Motion to Dismiss the Complaint filed concurrently herewith in further support of this defense.

### Second Affirmative Defense – Fraudulent Inducement

Plaintiff's claims are barred, in whole or in part, because Defendants were induced by Plaintiff's fraud and/or negligence to sign the agreement on which Plaintiff now sues. In particular, Defendants executed the SPA, based upon Mbanq's promises that: (i) Mbanq would pay Defendants the obligations when due under the Promissory Notes and the LOI totaling $1,055,000; (ii) Mbanq would issue stock for 150,000 shares to Park Capital together with an option allowing Park Capital to sell the shares back to Mbanq at $6.90 per share, valued at $1,035,000 (the "Put Option") (as evidenced in the LOI); (iii) that the stock issued would be valid; and (iv) that Mbanq would complete the minimum viable product to provide A4's services to its customers.

Defendants signed the SPA, the Promissory Notes, and the LOI in reasonable reliance on these misrepresentations which were made to Defendants for the purpose of persuading Defendants to sign the SPA and to transfer their interest in A4 to Mbanq. If Defendants had known or had reason to believe that the representations were false, Defendants would not have signed the SPA and would not have transferred their interest in A4 to Mbanq. The representations were false when Plaintiff made them, and Plaintiff, knowing that the representations were false, made them with the intent to deceive and defraud Defendants and secure Defendants' signature on the SPA and the transfer of Defendants' ownership interest in A4. Plaintiff's claims are barred, in whole or in part as a result of the false and fraudulent statements made by Mbanq.

### Third Affirmative Defense – Breach of Contract

Plaintiff's claims are barred, in whole or in part, due to Plaintiff's material breach of the SPA, including but not limited to Plaintiff's failure to: (i) pay amounts due under the Promissory Notes, which were executed in connection with the SPA; (ii) complete the minimum viable product to provide A4's services to its customers as required under the SPA; (iii) pay the nominal amount due and owing under the SPA for the transfer of the shares; and (iv) satisfy all other requirements under the LOI and Promissory Notes with respect to payments due to Defendants to complete the purchase of A4.

### Fourth Affirmative Defense – Failure to Mitigate Damages

Mbanq's claims against Defendants, if any, are barred or reduced by Mbanq's failure to mitigate, minimize, or avoid its damages, if any. Mbanq's failure to mitigate damages includes, but is not limited to: (i) Mbanq's failure to develop a minimum viable product for the technology platform for A4's services to successfully operate A4 as it was required to do under the SPA; (ii) Mbanq's failure to properly review and analyze all due diligence information that was provided by Defendants including but not limited to: reviewing and analyzing information regarding A4's assets, intellectual property, current state of software, legal, business relationships, customers, revenue, debts (including debts due to HelloBuild and Park Capital, which were evidenced in the tax returns and balance sheet of A4), profit, employees, and other aspects of its business structure and financials of A4; (iii) Mbanq's misrepresentations regarding A4 software as Software as a Service ("SaaS"); (iv) Mbanq's failure to provide sufficient due diligence to potential investors; and (v) Mbanq's failure to timely respond to

potential investors' due diligence inquiries, all of which may have impacted Mbanq's ability to raise additional funds after the acquisition of A4.

### Fifth Affirmative Defense – Unjust Enrichment

Mbanq's claims against Defendants, if any, are barred or reduced by the doctrine of unjust enrichment, in that Mbanq has been unjustly enriched as a direct result of Defendants' sale and transfer of all 107,204 shares of issued and outstanding common stock of A4 to Mbanq. By making the foregoing transfer to Mbanq, Defendants conferred benefits, including but not limited to, A4's reputation and goodwill, the assistance of its founder, the existing clients of A4, as well as a revenue stream, and intellectual property, which Mbanq received.[4] Mbanq knowingly appreciated, accepted, and retained such benefits and has not fully paid Defendants for such benefits and Defendants have been impoverished as a result thereof. There is no justification for Mbanq's enrichment or Defendants' impoverishment, and under the circumstances, it would be inequitable for Mbanq to retain such benefits without paying the value thereof.

### Sixth Affirmative Defense - Waiver

Mbanq's claims against Defendants, if any, are barred or reduced by Mbanq's continued use of the A4 software, by Mbanq's initial payments under the LOI and the Promissory Notes, and by Mbanq's issuance of the stock certificate. Mbanq also made four (4) payments under the LOI before executing the Promissory Notes and the SPA confirming and acknowledging that they owed the debt under the Promissory Notes. Moreover, the fact that the payments made under the LOI were deducted from the purchase price of A4 – which was confirmed by Mbanq in writing before Mbanq issued the Promissory Notes – further confirms the fact that the LOI was a part of the documents constituting Mbanq's acquisition of A4. Indeed, the Promissory Notes and the SPA, confirmed the same acquisition

---

[4] Indeed, as a result of Mbanq's acquisition of A4, Mbanq was able to have a sufficient concentration of credit union clients in the United States to form a CUSO (credit union service organization). The organization was formed based on Mr. Lopatine's written advice to Mbanq in March 2019, which Mr. Lopatine provided after the LOI was signed, and included facilitating an engagement with Guy Messick, a reputable CUSO attorney. Mbanq also had the privilege to became part of the NACUSO (National Credit Union Association). Obviously, this could not have been possible without a concentration of U.S. credit unions as clients which Mbanq obtained directly as a result of its acquisition of A4 from Counter-Plaintiffs and Mr. Ravnborg. Mr. Lopatine was fraudulently induced into providing the advice for no consideration.

---

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM                    Case No. 3:21-cv-6396-AGT

price, and terms, for Mbanq's acquisition of 100% interest in A4, as initially set forth in the LOI. Moreover, Mbanq repeatedly confirmed, verbally, in writing, and by making payments, its obligations under the LOI and the Promissory Notes. As a result, Mbanq waived any claim that the LOI or the Promissory Notes do not constitute a valid contract between the parties.

<b><u>Seventh Affirmative Defense – Failure of Consideration</u></b>

Mbanq's claims against Defendants, if any, are barred or reduced by failure of consideration. Mbanq has not provided fair and adequate agreed upon consideration to Defendants in exchange for receiving the A4 stock. Mbanq has failed to make full payment as required pursuant to the LOI, the Promissory Notes, and the SPA, and has failed to honor its stock option (as set forth in Defendants' Counterclaim below). Indeed, Mbanq has even failed to pay the nominal amount due and owing under the SPA for the transfer of the shares. Thus, Mbanq has failed to provide consideration for the shares of A4 that Defendants transferred to Mbanq.

<b><u>Eighth Affirmative Defense - Fraud</u></b>

Mbanq is precluded from recovery by reason of its acts and conduct constituting fraud which have caused Defendants damages. With specific intent to defraud, the Plaintiff, Mbanq, through its executives, Mr. Lounegov, and Mr. Valverde, knowingly devised their scheme to defraud Defendants (as set forth in the Counterclaim below), causing them to transfer their interest in A4 to Mbanq. These promises were false when made and were made, authorized, directed, approved, ratified, and/or adopted by Mbanq.

In particular, Mr. Lounegov on behalf of Mbanq, made certain promises and misrepresentations, including but not limited to, promises that: (i) Mbanq would pay Defendants the obligations when due under the Agreements; (ii) Mbanq would honor the Put Option; (iii) that the $25,000 monthly payments would be forthcoming; (iv) that Mbanq was a profitable company with sufficient cash flow to make the required payments under the Agreements; (v) that the stock was in fact issued to Park Capital; (vi) that Mbanq would pay HelloBuild under Promissory Note 2; and (vii) other representations made to induce Counter-Plaintiffs to transfer their interest in A4 to Mbanq. These misrepresentations were made with the positive intent by Mbanq never to fully perform the undertakings set forth in the Promissory Notes, the SPA, and the LOI.

Not only did Mbanq fraudulently induce Defendants to transfer their interest in A4, but Mbanq strung Defendants along with false promises and representations of forthcoming payments, and the issuance of fraudulent unregistered securities (including fraudulent and unregistered stock certificates and promissory notes), because Mbanq wanted to reap the benefit of A4 and its client relationships in the United States, without having to pay for it. Mbanq made the misrepresentations purposefully, knowing at the time it made the representations at issue that they were false, and/or making them recklessly without regard for their truth because Mbanq had an ulterior motive to defraud the Defendants.

As a result, Defendants gave up their interest in A4 for: (i) illusory compensation, (ii) false promises, (iii) fraudulent unregistered securities (including fraudulent and unregistered stock certificates and promissory notes); and (iv) a false Put Option, in justifiable reliance on the representations made by Mbanq. Defendants have been, and continue to be damaged.

### Ninth Affirmative Defense – Assumption of Risk

Mbanq's claims against Defendants, if any, are barred or reduced because Mbanq voluntarily assumed the risk of injury which Mbanq allegedly sustained regarding the state of the A4 software. Specifically, from February 21, 2019 through June of 2019, Mbanq conducted thorough due diligence on A4, including but not limited to, open access to A4's books and records in connection with the proposed transaction. Mbanq's due diligence included: reviewing and analyzing information regarding A4's assets, intellectual property, current state of software, legal, business relationships, customers, revenue, debts (including debts due to HelloBuild and Park Capital, which were evidenced in the tax returns and balance sheet of A4), profit, employees, and other aspects of its business structure and financials. All relevant materials including all those requested by Mbanq were provided mainly by Mr. Ravnborg, the legacy owner and Chief Executive Officer A4, and also at times by Mr. Lopatine, directly to Daniel Davis ("Mr. Davis"), Mbanq's controller.

Mbanq clearly understood during the due diligence period that the agreements with the clients of A4 were not long term (month-to-month), and Mbanq had the opportunity over four months after the signing of the LOI, to contact each of the clients (e.g. to arrange a phone call with each one) and to verify any details regarding their agreements with A4.

Mbanq's due diligence  was done, in part, through various emails and phone calls between Mbanq and Defendants. Indeed, Mbanq had sufficient diligence to identify declining trends in the number of A4 clients, and revenue, since 2015 – as evidenced in Mr. Davis' email to Mr. Lounegov prior to the acquisition – yet Mbanq ultimately decided to proceed with its acquisition of A4 from Defendants for the $2,090,000 acquisition price and close on the transaction by signing the SPA, the Promissory Notes, and issuing shares to Park Capital and Mr. Ravnborg.

After having completed its due diligence, Mbanq was aware of the profitability of and financials for A4 and decided to proceed when it executed the LOI, the SPA, and the Promissory Notes. In particular, Mbanq reviewed and analyzed, among other things, A4's: (i) annual statements; (ii) bylaws; (iii) capitalization table; (iv) revenues; (v) products; (vi) monthly trial balances; (vii) financial statements for 2017 through 2019; (viii) month-to-month customer contracts; (ix) vendor, and employment contracts; (x) liabilities (including but not limited to debts owed to Park Capital and HelloBuild); and (xi) the current state of the software and the work Mbanq would need to complete to satisfy A4's clients' needs post acquisition.

Mbanq cannot argue that it did not have enough information regarding A4, its existing operations, or client lists, when Mbanq was aware of the profitability and financials of A4 and decided to proceed when it executed the Stock Purchase Agreement, the LOI, and the Promissory Notes. As a sophisticated investor, Mbanq was fully aware of the status and condition of A4 as a company, including but not limited to its software, before it acquired it from Defendants and assumed the risk associated with purchasing A4 from Defendants.

### Tenth Affirmative Defense – Estoppel

Mbanq's claims against Defendants, if any, are barred or reduced by the doctrine of estoppel. Mbanq falsely represented and promised that in exchange for receiving full ownership of A4, Mbanq would, among other things: (1) pay Park Capital the $25,000.00 monthly payments when due, as described in Promissory Note 1 and the LOI; (2) pay Park Capital the total outstanding amount under Promissory Note 1 when it obtained $4,000,000.00 in cash flow or at the latest, 24 months after signing the Promissory Notes; (3) pay HelloBuild the sum of $188,496.00 and Holdings the sum of $83,000.00 when it obtained $4,000,000.00 in cash flow or at the latest, 24 months after signing the

Promissory Notes; (4) issue 150,000 shares to Park Capital; and (5) honor the Put Option to buy Park Capital's shares in Mbanq at $6.90 a share.

Defendants reasonably, detrimentally, and foreseeably relied upon Mbanq's misrepresentations by transferring their ownership in A4 to Mbanq and faithfully and diligently providing services to Mbanq in connection with the acquisition of A4. However, to Defendants' detriment, Mbanq changed its position, and, among other things failed to: (1) pay Park Capital the $25,000.00 monthly payments when due, as described in Promissory Note 1 and the LOI; (2) pay Park Capital the total outstanding amount under Promissory Note 1 when it obtained $4,000,000.00 in cash flow or at the latest, 24 months after signing the Promissory Notes; (3) pay HelloBuild the sum of $188,496.00 and Holdings the sum of $83,000.00 when it obtained $4,000,000.00 in cash flow or at the latest, 24 months after signing the Promissory Notes; (4) issue 150,000 shares to Park Capital; and (5) honor the Put Option to buy Park Capital's shares in Mbanq at $6.90 a share. As a proximate result, Defendants have been damaged.

Injustice can be avoided only by enforcement of Mbanq's promises.

### Eleventh Affirmative Defense – Unclean Hands

Mbanq's claims against Defendants, if any, are barred or reduced by the doctrine of unclean hands in that, *inter alia*, Mbanq has defrauded Defendants by inducing them to transfer their interest in A4 to Mbanq for, among other things, fraudulent unregistered securities (including fraudulent and unregistered stock certificates and promissory notes), and falsely-promised compensation. In addition, Mbanq has wrongfully breached the LOI, the Promissory Notes, and the Stock Purchase Agreement, and is wrongfully seeking to declare that the LOI and the Promissory Notes do not exist. Mbanq also wrongfully seeks to declare that its shares were never issued to Park Capital, despite repeatedly confirming that the stock certificate was indeed issued and signed by both Mr. Valverde and Mr. Lounegov, confirming in writing before Defendants and Mr. Ravnborg agreed to sign the SPA and the Promissory Notes, as set forth in the Counterclaim below.

### Twelfth Defense – Damages Caused by Own Acts

Mbanq's alleged damages were caused by its own actions and conduct, including, but not limited to, its: (i) failure to develop the A4 software as it was required to do under the SPA; (ii)

---

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM                    Case No. 3:21-cv-6396-AGT

Mbanq's failure to properly review and analyze all due diligence information that was provided by Defendants; (iii) Mbanq's misrepresentations to investors and customers regarding A4 software as SaaS; (iv) Mbanq's misrepresentations that Mbanq was a profitable company with sufficient cash flow to make the required payments to Defendants under the Agreements; (v) Mbanq's misrepresentations that the stock was in fact issued to Park Capital; (vi) Mbanq's failure to provide sufficient due diligence to potential investors; and (vii) Mbanq's failure to timely respond to potential investors' due diligence inquiries, all of which may have impacted Mbanq's ability to raise additional funds after the acquisition of A4.

### Thirteenth Defense – Bad Faith

Mbanq is precluded from recovery by reason of its acts and conduct constituting bad faith. Mbanq (including Mr. Lounegov, Mr. Valverde, and Mr. Reynoso) intentionally defrauded Defendants and Mr. Ravnborg of their A4 shares through: (i) a series of intentionally-made false promises; (ii) partial payments intended to lead Counter-Plaintiffs on; (iii) fraudulent unregistered securities (including fraudulent and unregistered stock certificates and promissory notes).

### Fourteenth Defense – Illegality

Mbanq is precluded from recovery by reason of illegality. Mbanq intentionally issued fraudulent unregistered securities: shares and promissory notes, in order to fraudulently induce Counter-Plaintiffs and Mr. Ravnborg to transfer their 100% interest in A4.

### Fifteenth Defense – Conditions Precedent

Defendants deny that Mbanq has satisfied conditions precedent to bring its action, including, *inter alia*, its failure to properly perform, including, but not limited to, its: (i) failure to develop the A4 software as it was required to do under the SPA; (ii) Mbanq's failure to properly review and analyze all due diligence information that was provided by Defendants; (iii) Mbanq's misrepresentations to investors and customers regarding A4 software as SaaS; (iv) Mbanq's misrepresentations that Mbanq was a profitable company with sufficient cash flow to make the required payments to Defendants under the Agreements; (v) Mbanq's misrepresentations that the stock was in fact issued to Park Capital; (vi) Mbanq's failure to provide sufficient due diligence to potential investors; and (vii) Mbanq's failure to timely respond to potential investors' due diligence inquiries. In addition, Mbanq

failed to act in good faith in the performance of, obligations under the LOI, the Promissory Notes, and the SPA.

### Sixteenth Defense - Setoff

Any alleged damages of Mbanq must be eliminated or reduced to the extent of setoff of any and all damages incurred by Defendants as more fully alleged in the Counterclaim.

**WHEREFORE,** Defendants, ALEXANDER LOPATINE, PARK CAPITAL HOLDINGS, LLC, and PARK CAPITAL VENTURES, LLC, having fully answered the allegations in the Complaint and asserted their affirmative defenses thereto, respectfully request that judgment be entered in their favor and against Plaintiff, FINLINK, INC. d/b/a MBANQ, and for such other relief as this Court deems just and proper.

//

//

**COUNTERCLAIM**

Counterclaim Plaintiffs, ALEXANDER LOPATINE ("Mr. Lopatine"), PARK CAPITAL HOLDINGS, LLC, ("Holdings"), PARK CAPITAL VENTURES, LLC, ("Ventures") (collectively, Holdings and Ventures are a group of companies belonging to one shareholder, Mr. Lopatine, and are hereinafter referred to as "Park Capital"), and HELLOBUILD, LLC ("HelloBuild") (collectively, the "Counter-Plaintiffs"), by and through undersigned counsel sue Counterclaim Defendant, FINLINK, INC. d/b/a MBANQ ("Counter-Defendant" or "Mbanq") and allege as follows:

## I. INTRODUCTION AND SUMMARY OF BACKGROUND FOR DISPUTE

1.    This is a simple and straightforward collection action that arises from Mbanq's defaults under several interconnected and interrelated agreements, including: a Letter of Intent ("LOI"), a Stock Purchase Agreement ("SPA"), and two promissory notes, which were supplemental agreements to the SPA specifically (the "Promissory Notes") (collectively, the "Agreements"), between Counter-Plaintiffs and Mbanq, for the sale of Agilityfour, Inc. a/k/a KMR, Inc. ("A4")—a company involved in the design, development, and commercialization of online banking applications for credit unions—to Mbanq. The case also involves Defendant's fraudulent inducement of Counter-Plaintiffs to transfer their interest in A4, and related claims as set forth below.

### A.    The Parties Enter Into the Agreements

2.    Pursuant to the Agreements between Mbanq, Counter-Plaintiffs, and Mr. Kai Ravnborg ("Mr. Ravnborg") — the legacy owner and previous Chief Executive Officer of A4, Mbanq was required to pay Counter-Plaintiffs $2,055,000[5], and $85,000 to Mr. Ravnborg[6], for a 100% interest in A4. The parties structured the sale of A4 such that Mbanq would pay for part of the purchase by $1,055,000 in cash payments over time (as evidenced by LOI and the Promissory Notes) and partially by Mbanq issuing

---

[5] This amount includes, among other things, HelloBuild's 3% interest in A4, which were options it received as part payment for its services. HelloBuild was also owed $188,496, for invoices outstanding for work performed. As part of the sale of A4 to Mbanq, HelloBuild assigned 3% of interest in A4 to Park Capital.

[6] Mbanq was required to pay Mr. Ravnborg $35,000 in cash pursuant to one of the Promissory Notes, and to issue shares to Mr. Ravnborg worth approximately $50,000. Mr. Ravnborg also received additional compensation by way of an employment agreement with Mbanq, and benefits which both he and his wife received.

---

a stock certificate for 150,000 shares together with an option allowing Park Capital to sell the shares back to Mbanq at $6.90 per share, valued at $1,035,000 (the "Put Option") (as evidenced in the LOI).

3. After Mbanq represented that all Agreements were fully executed and stock was issued to Park Capital and Mr. Ravnborg, as required under the agreements, Counter-Plaintiffs and Mr. Ravnborg signed the SPA which contained a sale price for nominal value and transferred their entire interest in, A4 to Mbanq, based upon the agreement and understanding that the other agreements (providing over $2 million in compensation to Counter-Plaintiffs and Mr. Ravnborg in exchange for transfer of 100% of A4 to Mbanq) were also being simultaneously executed by the parties. Thereafter, however, Mbanq defaulted by repeatedly failing to make timely and complete payments due under the Agreements. It now appears to be clear that the Counter-Plaintiffs and Mr. Ravnborg were fraudulently induced to enter into the SPA, under fraudulent representations and fraudulent securities (including fraudulent promissory notes, and fraudulent stock certificates).  Indeed, Mbanq even failed to pay the nominal amount of $107.41 due and owing under the SPA for the transfer of A4 shares.

**B.    Mbanq Breaches the Agreements**

4. During the performance of the Agreements, Mbanq also falsely represented that Mbanq had sufficient funds and resources to operate A4, and to develop the Minimum Viable Product ("MVP") to complete the A4 software in order to ensure that it is fully operable. However, after acquiring A4, Mbanq failed to develop the A4 software as it was required to do under the SPA, Exhibit C. This was critical to ensure that Mbanq would preserve and realize the full value of A4, together with its intellectual property, its team, reputation, as well as its business relationships. A true and correct copy of the SPA is attached hereto as **Exhibit "A"** (Mbanq "has sufficient resource and funding to operate the business of A4 . . . including development of a minimum viable product for a technology platform for A4's services as described on Exhibit C . . . ").

5. Counter-Plaintiffs repeatedly attempted to resolve the dispute both verbally and in writing. Despite false promises and assurances, verbally and in writing, to pay the debt in full, and numerous monthly partial payments made by Mbanq, pursuant to Mbanq's obligations under the Agreements (the LOI, Promissory Notes and the SPA), Mbanq failed and refused to cure its repeated defaults over the course of: (i) 18 months after executing the LOI, and (ii) 13 months after Mbanq's final

closing of its acquisition of A4. Instead, after August 20, 2020, Mbanq ultimately ceased making payments altogether and refused to honor the Put Option.

6.      Mbanq made several initial payments (toward its acquisition of A4) under the LOI, completed its due diligence – including but not limited to the financials of A4, the condition of the software of A4, its business relationships, legal issues, and other due diligence, then provided the fully signed final share certificates to both Park Capital and Mr. Ravnborg, executed the Promissory Notes, which: (1) confirmed and excluded prior payments Mbanq already made toward the acquisition of A4, and (2) set forth remaining payments (after subtracting those Mbanq already made for the A4 acquisition under the LOI) due to Counter-Plaintiffs for Mbanq's 100% purchase of A4.

7.      As agreed in the LOI, the parties negotiated and signed four (4) additional commercial agreements in connection with Mbanq's acquisition of A4, which are: (i) the Promissory Notes, (ii) the SPA, and (iii) Mr. Ravnborg's employment agreement. The Promissory Notes were contingent on the execution of the SPA, and that is why it was necessary for the Promissory Notes to be fully executed before the 100% of shares in A4 were transferred to Mbanq under the SPA. Similarly, the Promissory Notes confirmed the acquisition price for A4 which was already set forth in the LOI, and thus supported the full price of the A4 acquisition (in addition to the nominal amount set forth in the SPA). Mbanq's acquisition of A4 was not contingent on any additional consulting agreement (whether as an advisory consulting agreement, or the Head of Americas Agreement, as alleged by Mbanq in its Complaint). The LOI, the Promissory Notes and the SPA constituted the entire agreement between the parties for the sale of A4 to Mbanq.[7]

8.      Mbanq made four (4) payments under the LOI before executing the Promissory Notes and the SPA, which further confirms that the LOI was a legally binding agreement. Moreover, the fact that the payments made under the LOI were deducted from the purchase price of A4 – which was confirmed by Mbanq in writing before Mbanq issued the Promissory Notes – further confirms the fact that the LOI was a part of the documents constituting Mbanq's acquisition of A4.

---

[7] Mr. Ravnborg's employment agreement with Mbanq is not currently at issue in this litigation. The employment agreement did not contain any provision for payment from Mbanq to Mr. Ravnborg by issuance of shares; rather the shares were issued in connection with the LOI, the SPA, and the Promissory Notes for the purchase of A4.

9.      Mbanq then continued to make several payments under the Promissory Notes, before ultimately defaulting on its payment obligations altogether. Having received the benefit of 100% interest in A4, the A4 software, A4's U.S.-based clients, the credibility of the reputation, as well decades of experience of, A4 and its team in credit union space, including Mr. Ravnborg (which Mbanq currently still advertises on its website[8]), Mbanq now disingenuously asserts that the Agreements were never real, and incredibly the Mbanq shares were never issued. If that were true, then this was all part of a fraudulent scheme orchestrated by Mbanq (including Mr. Lounegov, Mr. Valverde, and Mr. Reynoso) to defraud Counter-Plaintiffs and Mr. Ravnborg of their A4 shares through: (i) a series of intentionally-made false promises; (ii) partial payments intended to mislead Counter-Plaintiffs to delay seeking legal recourse and to induce Counter-Plaintiffs to continue to cooperate; and (iii) fraudulent unregistered securities (including fraudulent and unregistered stock certificates and promissory notes).[9]

10.      Specifically, beginning on April 4, 2019, Mbanq paid the first installment of $50,000 as required in the LOI and then continued making $25,000 monthly payments to Park Capital pursuant to the LOI, by bank transfer.  Subsequently, Mr. Lounegov represented that Mbanq did not have sufficient funds to continue making payments as agreed, and Mr. Lounegov thereafter proceeded to make sporadic payments (most of which were partial, incomplete, and untimely), on behalf of Mbanq, by Venmo, PayPal, and other means[10], based on the $25,000 monthly invoices issued to Mbanq under the Promissory Notes.

---

[8] Prior to Mbanq's acquisition of A4, Mbanq did not have any experience in the U.S. credit union space.

[9] Indeed, as a result of Mbanq's acquisition of A4, Mbanq was able to have a sufficient concentration of credit union clients in the United States to form a CUSO (credit union service organization). The organization was formed based on Mr. Lopatine's written advice to Mbanq (which was served through fraudulent promises of performance by Mbanq) in March 2019, which Mr. Lopatine provided after the LOI was signed, and included facilitating an engagement with Guy Messick, a reputable CUSO attorney. Mbanq also had the privilege to became part of the NACUSO (National Credit Union Association). Obviously, this could not have been possible without a concentration of U.S. credit unions as clients which Mbanq obtained directly as a result of its acquisition of A4 from Counter-Plaintiffs and Mr. Ravnborg.

[10] In its Complaint, Mbanq alleges that payments were made by Venmo and PayPal, but those payments represented approximately 10% of the amounts Mbanq paid in total based on Promissory Notes to Park Capital, on behalf of Mbanq, for invoices issued to Mbanq under the Promissory Notes. The remaining 90% of the payments Mbanq made to Park Capital were sent directly to Park Capital's bank

---

11.     However, after the last payment of $5,000 on August 20, 2020 and after Park Capital's attorney contacted Mbanq to agree upon a structured payment plan, Mbanq stopped making any payments altogether. Mr. Lounegov also falsely represented at that time (and confirming the Agreements) that Park Capital owned approximately 2% of Mbanq, but that Mbanq would now "rescind" those shares – without providing any basis for such rescission which would have been unauthorized and improper.

**C.     Mbanq Incredibly Claims Agreements and Stock Certificate Do Not Exist**

12.     Subsequently, Mbanq would falsely represent that Park Capital did not have any interest in Mbanq and that the shares were never issued. It is now clear that this was simply a tactic by Mbanq to justify its avoidance and refusal to honor its obligations under the Agreements with Counter-Plaintiffs. At that time, Mbanq was over $200,000 behind on its monthly payment obligations under the Promissory Notes (as reflected in the Excel spreadsheet provided by Mr. Lopatine to Mr. Lounegov, which was also attached to Mbanq's Complaint as Exhibit C).

13.     Furthermore, as alleged below, Mbanq also breached the Put Option, which required Mbanq to purchase Park Capital's 150,000 Mbanq shares at the price of $6.90 per share for a total of $1,035,000. Twelve (12) months after the acquisition of A4, as agreed in the LOI, on December 12, 2020, Mr. Lopatine sent Mbanq an email demanding that Mbanq honor the Put Option and Mbanq simply ignored the demand, and subsequently made spurious arguments by falsely stating that the fully signed share certificate, executed by two executives of Mbanq, provided as part consideration for the acquisition of Mbanq was an illusion and that Mr. Lopatine and Mr. Ravnborg must have both just 'wanted to see how a (signed) share certificate would look like.' Although Park Capital exercised its Put Option, Mbanq failed to purchase the shares at the agreed-upon price and to pay Park Capital for those shares.

14.     In a bizarre twist, Mbanq now claims that it never issued the share certificate to Park Capital. However, the stock certificate was not only issued by Mbanq, and signed by its Chief Executive Officer ("CEO") Vladimir Lounegov ("Mr. Lounegov"), and its Vice President of Corporate

---

account by bank transfer. Therefore, Mbanq's assertions in the Complaint that the payments were made by PayPal and Venmo to Mr. Lopatine as a favor, or as some kind of loan or gift, are only allegations which appear to be made to mislead, and to further harass and defame Mr. Lopatine.

Development, and Secretary, Javier Valverde ("Mr. Valverde"), but Mbanq confirmed in writing, *several times*, that the stock certificate was issued and valid before the parties agreed to transfer the interest in the A4 shares (not a "draft"), and Mr. Lounegov pleaded Mr. Lopatine to execute the SPA for a nominal amount on the basis that the Promissory Notes were signed and the shares were fully issued, valid, and represented the amount of shares allocated to Park Capital and Mr. Ravnborg in Mbanq's capitalization table, as represented by Mr. Valverde in separate emails containing the share certificates, to Mr. Lopatine and Mr. Ravnborg.

15.     Both Park Capital and Mr. Ravnborg received their respective signed share certificates (Mr. Lopatine on behalf of Park Capital, through his Park Capital email) on the same day, July 9, 2019, from Mbanq – with the same exact wording from Mr. Valverde from Mbanq's corporate email account – before signing the Promissory Notes and the SPA. Indeed, Mbanq executives, Mr. Lounegov, Mr. Valverde, confirmed multiple times (after the share certificates were sent to Mr. Lopatine and Mr. Ravnborg) that the shares were indeed valid and issued and that the certificates represent the true number of allocated shares on Mbanq's capitalization table. It is clear this was all done in order to falsely induce Park Capital and Mr. Ravnborg to sign the SPA to transfer A4 to Mbanq in exchange for what Mbanq essentially claims are unregistered and fraudulently issued shares.

**D.     Mbanq's Fraud Against the Defendants**

16.     Thus, Mbanq's fraud was consummated through multiple written and verbal communications from Mbanq, including communications from Mr. Lounegov, as well as Mr. Valverde, and Mr. Reynoso. For example, on July 9, 2019, Mbanq sent Mr. Lopatine two emails including one final email stating "[p]lease find attached Park Capital Ventures, LLC Share Certificate" and asking Mr. Lopatine to check for errors, and assuring Mr. Lopatine that the certificate "denotes the fully vested number of shares allocated" to Park Capital on Mbanq's "capitalization table." A true and correct copy of the emails and communications together with the stock certificate is attached hereto as **Exhibit "B."** If the stock certificate was never issued, then this statement was clearly an intentional misrepresentation intended to induce Mr. Lopatine to execute the SPA.

17.     Relying on the July 1, 2019 email which referred to a "draft" is misleading to the Court, since on July 9, 2019, Mr. Lounegov sent an email that confirmed Mr. Valverde would be sending a

share certificate (not draft), and Mr. Valverde followed up with an email also on July 9, 2019 attaching the share certificate. *See id.*

18.    Faced with its indefensible breaches under the Agreements to: (i) make payments to Counter-Plaintiffs under the SPA and the Promissory Notes, (ii) satisfy the buyback obligations under the Put Option, and (iii) that Mbanq did not have sufficient funds and resources to run A4 and to develop the MVP as Mbanq was required to under the SPA, Mbanq has reverted to desperate, baseless, and fraudulent allegations that the agreements did not "exist" – despite: (i) having signed those Agreements, (ii) making payments under the Agreements including the LOI and the Promissory Notes, (iii) inducing Counter-Plaintiffs to sign the Agreements on the basis of written representations and promises and issued stock certificates, (iv) as well as and receiving stock in A4 under those Agreements and (v) using the A4 acquisition actively in marketing Mbanq to investors and clients.

19.    Mbanq now argues, without basis in fact or law, that it never issued the stock despite repeatedly: (1) confirming that the stock certificate was indeed issued and signed by both Mr. Valverde and Mr. Lounegov, and (2) confirming in writing before the Counter-Plaintiffs and Mr. Ravnborg agreed to sign the SPA and the Promissory Notes, as set forth below. Conveniently, these baseless assertions come over two years *after* Counter-Plaintiffs were induced to sell and fully transfer their ownership interest in A4 to Mbanq for: (1) illusory consideration and false promises, and (2) for fraudulent unregistered securities, in the form of two Promissory Notes and a share certificate.

20.    Indeed, Mbanq did not identify any of the alleged issues with the A4 software[11], clients, revenue, or any other aspect of the business – and continuously promised to make payments under the Promissory Notes, and advertised to the public that Mr. Lopatine had joined Mbanq, and A4 was a successful addition to the company – until Counter-Plaintiffs sued Mbanq in Florida for, among other things, breach of the LOI, breach of the Promissory Notes, and Unjust Enrichment.  It was only after Mbanq was sued in Florida, in an attempt to recover the amounts overdue and outstanding under the

---

[11] Indeed, Mr. Alava remained available after the closing of the A4 transaction, to assist with any issues with the A4 software, but Mbanq failed to identify any issues or to contact HelloBuild regarding any purported issues.

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM                      Case No. 3:21-cv-6396-AGT

Promissory Notes – which Counter-Plaintiffs have been trying, in good faith, to obtain from Mbanq – that Mbanq invented the defenses it now alleges before this Court in its Complaint.

21.     Having no other defenses, Mbanq has also resorted to baseless and false allegations of fraud against Counter-Plaintiffs, seeking to defame the Counter-Plaintiffs. This is ironic given that ***Mbanq*** is the party that has defrauded the Counter-Plaintiffs in multiple ways, as evidenced by: (1) the indisputable clear defaults under the signed, written Agreements, (2) fraudulent securities issued by Mbanq in the form of two Promissory Notes, and an unregistered and fraudulent stock certificates which Mbanq did not register in its books or capitalization table, despite advising Counter-Plaintiffs to the contrary multiple times. As a result, Counter-Plaintiffs are owed over $2 million, including all applicable interest, costs, attorney's fees, and other damages, after accounting for $221,397 in payments already made under the Promissory Notes and the LOI.

## II.  THE PARTIES, JURISDICTION, AND VENUE

22.     Counter-Plaintiff, Mr. Lopatine, is a resident of Miami-Dade County, Florida and is otherwise *sui juris*. Mr. Lopatine is a well-established, reputable, credentialed businessman and a recognized entrepreneur and executive/strategist in financial, banking and technology sectors. He is the CEO of Park Capital, which invested in A4. Mr. Lopatine also previously cofounded and was the CEO of Nymbus, a company in the Financial Technology ("Fintech") space which raised over $140 million, and is one of the most respected Fintech startups, and including approximately $100 million raised in the last nine (9) months. Park Capital is still a shareholder of Nymbus.

23.     Counter-Plaintiff, Holdings, is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. Mr. Lopatine is the sole member of Holdings, which is part of Park Capital.

24.     Counter-Plaintiff, Ventures, is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. Mr. Lopatine is the sole member of Ventures, which is part of Park Capital.

25.     Counter-Plaintiff, HelloBuild, is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. HelloBuild is a Florida company focused on digital product development and software design. HelloBuild's currently has two members are residents of

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM                    Case No. 3:21-cv-6396-AGT

Miami, Florida. HelloBuild developed software that was one of the assets of A4, which was sold to Mbanq, and received options and payments from A4.

26. Counter-Defendant, Mbanq, is a Delaware corporation with its principal place of business in, and doing business in, Sonoma County, California (not in Silicon Valley as Mbanq claims).

27. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because it involves a civil action arising under the laws of the United States and pursuant to 28 U.S.C. § 1332(a)(2), because it is between citizens and residents of the State of Florida and a citizen of California.

28. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, and 18 U.S.C. § 1961. The claims by the Counter-Plaintiffs against the Counter-Defendant are so related to the claims in the action within the Court's original jurisdiction that they form part of the same case or controversy. The exercise of personal jurisdiction over Counter-Defendant is proper in this district under 18 U.S.C. § 1965(a) because Mbanq has conducted substantial and not isolated activity (personally or through their representative and/or agents) in California throughout the applicable time, including holding and/or utilizing bank accounts in California, conducting meetings relating to the allegations in the Counterclaim, and directing many of the fraudulent misrepresentations and activities described in the Counterclaim either to or from California.

29. Additionally, Mbanq has invoked the jurisdiction of the United States District Court for the Northern District of California by initiating legal action here and thus enjoying the benefits and privileges of doing business in and litigating in the Courts located in California. The Counterclaim is also so related and intertwined with the allegations in Plaintiff's Complaint, that they form part of the same case or controversy.

30. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a) because a significant portion of the transactions and events or omissions giving rise to the Counterclaim occurred in this district, and Counter-Defendant initiated an action in this district and thus invoked the Court's jurisdiction. The parties' relationship is also centered in this district. Specifically, Mbanq engaged in negotiation and made numerous fraudulent misrepresentations in connection therewith to purchase A4 and communicated with Counter-Plaintiffs from Mbanq's offices in California.

### III.  GENERAL ALLEGATIONS

**A.      COUNTER-PLAINTIFFS AGREE TO SELL A4 TO MBANQ**

31.      Mbanq purports to be a Silicon Valley based financial technology company (even though it is not actually based in Silicon Valley) and represents itself as providing digital banking technologies to banks on a Software as a Service ("SaaS") basis. Counter-Plaintiffs have discovered (after closing of the Agreements) that Mbanq had only sixteen (16) clients in Croatia and Montenegro which were paying maintenance fees for a legacy on-premise software product[12] created initially in 2004, which Mbanq acquired, based on an acquisition of a company in Croatia. This was software was installed on client servers, rather than being provided by Mbanq in the cloud, as would be the case for typical modern SaaS products.

32.      Therefore, as of August 2020, Mbanq did not have its "cloud-based" product live, and therefore effectively was not a SaaS provider, and this is one of a number of other misrepresentations which Mbanq has made to Counter-Plaintiffs, as well as its customers and investors. This is important because SaaS companies typically have significantly greater valuations and by misrepresenting itself as a SaaS company, Mbanq misrepresented the nature of the business and effectively inflated the value of the shares which were provided to Park Capital and Mr. Ravnborg as part of the compensation for Mbanq's acquisition of A4.

33.      On February 9, 2017, Mr. Lopatine was introduced, via email, to Mr. Lounegov by Alexis Kalmanovitz, an investment banker, with whom Mr. Lopatine worked before. Mr. Lounegov followed up with a business call to Mr. Lopatine on February 14, 2017, and the two discussed  Mbanq. Mr. Lounegov explained Mbanq's business model which was apparently inspired by the business model of Nymbus – the company that Mr. Lopatine previously cofounded and ran as CEO.

34.      On August 21, 2018, Mr. Lounegov and Mr. Valverde at Mbanq met with Mr. Lopatine in person, at 5:00pm at Salumeria 104, 3451 NE 1st Avenue, Unit 104, in Miami, Florida. At that meeting, Mr. Lounegov, Mr. Valverde and Mr. Lopatine discussed Mbanq's business and the sales strategy of

---

[12] On-premises software (also referred to as on-premise) is installed and runs on computers on the premises of the person or organization using the software, rather than at a remote facility such as a server farm or cloud.

Mbanq and the fact that Mbanq was looking for United States-based investors and Venture Capital funds to invest in Mbanq. Mr. Lounegov represented himself as a sophisticated investor, and that his company, Mbanq, wanted to expand its United States presence, customer base, and acquire different types of software to better serve its clients in the United States. At that time, Mbanq represented that it did not have any clients in the United States.

35.     On August 22, 2018, Mr. Valverde sent Mr. Lopatine an email with Mbanq's investor pitch deck, because Mbanq was requesting Mr. Lopatine's assistance to introduce Mbanq to investors.

36.     On October 29, 2018, Mr. Lopatine also sent Mr. Lounegov a Nondisclosure Agreement ("NDA") with Holdings, in connection with discussions regarding the A4 acquisition, as a way for Mbanq to enter the United States market, acquire its first clients in the United States, and to be able to show to investors in the United States that they have clients in the United States. Mr. Lounegov signed the NDA on behalf of Mbanq.

37.     After the NDA was signed, on October 29, 2018, Mr. Lopatine introduced Mbanq to Mr. Jonatan Alava of HelloBuild, which was a software development company that helped develop A4's new software, and was an investor in A4.[13]

38.     Mr. Lounegov thereafter also scheduled and attended an introductory conference call with the Mbanq team and with Mr. Lopatine (individually and on behalf of Park Capital) and Mr. Alava. The NDA was necessary in order to further the communications between Mbanq and Counter-Plaintiffs regarding Mbanq's desire to purchase A4 from Counter-Plaintiffs in order to create Mbanq's United States presence and customer base.

39.     Collectively, the Counter-Plaintiffs owned 95.3% of A4. In particular, HelloBuild and Mr. Lopatine, through Park Capital, owned 95.3% of the ownership interest in A4. Mr. Ravnborg owned approximately 4.7% of the remaining interest in A4.

40.     After Mbanq signed the NDA, in November of 2018, the parties began formalizing the terms by which Mbanq would purchase A4 from Counter-Plaintiffs, through the LOI. Mr. Lounegov on

---

[13] HelloBuild had an agreement with A4 to develop the digital banking software, and A4 ultimately owed HelloBuild sum of $188,496.00 in connection with that agreement, and pursuant to the invoices HelloBuild issued to A4.

behalf of Mbanq created a Google Document for the draft LOI, which was shared with Mr. Lopatine. This LOI was later approved by Mr. Reynoso, as the Chairman of Mbanq, prior to the signing of the LOI by Lounegov on February 21, 2019. Part of Mbanq's approval and due diligence was Mr. Lopatine's meeting with Mr. Reynoso in Miami, Florida, and a subsequent conference call immediately before closing the LOI in February 2019, with Mr. Reynoso, Mr. Lounegov, Mr. Valverde, and Mr. Lopatine participating.

41.     From November 2018 through February 21, 2019, the LOI was negotiated and approved by Mbanq's executives, including its Chairman. Before signing the LOI, Mbanq confirmed and agreed in writing that the acquisition price would not change – whether the clients or personnel were on-boarded from A4 to Mbanq or not – and it was also clear that time was of the essence and that new software needed to be provided by Mbanq (or they would have to invest additional funds by hiring HelloBuild to complete A4's software). Mbanq also understood and agreed that Park Capital would not run the A4 company after the acquisition, and would simply provide assistance in good faith if needed. Indeed, Mr. Lounegov initially attempted to make Mbanq's purchase price contingent on whether A4 clients and employees would stay twelve (12) months after Mbanq's acquisition of A4. Mr. Lopatine rejected this suggestion, in writing, with explicit comments and deleted that clause from the LOI. Mr. Lounegov confirmed Mbanq's agreement to the fact that payment would *not* be dependent on these factors, in an email to Mr. Lopatine, copying Mr. Reynoso and Mr. Valverde.

42.     On February 21, 2019, Mbanq and Mr. Lopatine executed the LOI, which described all of the essential terms of the agreement for Counter-Plaintiffs and Mr. Ravnborg to sell their 100% interest in A4 to Mbanq for $2,090,000. A true and correct copy of the LOI is attached hereto as **Exhibit "C."** After the LOI was signed, the material terms (including Mbanq's acquisition price of A4) of the LOI have not changed.

43.     Under the LOI, Mbanq was required to, among other things: (a) make payments to Mr. Lopatine in monthly installments of $25,000.00, with a first payment in the amount of $50,000, and (b) issue shares to Park Capital and providing an option to sell those shares to Mbanq at $6.90 per share. However, if Mbanq received $4,000,000 or more in a funding round, or twenty-four (24) months from

closing passed, Mbanq was required to pay the full outstanding Purchase Price. Both Mr. Lounegov and Mr. Lopatine signed the LOI, on behalf of their respective companies. *See id.*

44.     From February 21, 2019 through June of 2019, Mbanq conducted thorough, extensive, due diligence on A4, including but not limited to, reviewing and analyzing information regarding A4's assets, intellectual property, current state of software, legal, business relationships, customers, revenue, debts (including debts due to HelloBuild and Park Capital, which were evidenced in the tax returns and balance sheet of A4), profit, employees, and other aspects of its business structure and financials. All relevant materials including all those requested by Mbanq were provided mainly by Mr. Ravnborg, the legacy owner and Chief Executive Officer A4, and also at times by Mr. Lopatine, directly to Daniel Davis ("Mr. Davis"), Mbanq's controller.

45.     Mr. Lopatine provided information mainly in his capacity as the CEO of Park Capital, the company that was an investor in A4. Mr. Lopatine was not involved in the day-to-day operations of A4 and was not a signatory on its bank account. Mr. Lopatine also did not have any personal relationship with A4's clients, and had not individually spoken to any of A4's clients directly, but was responding to some of Mbanq's inquiries in due diligence on behalf of Park Capital, which invested in A4 slightly more than a year prior to its sale to Mbanq. Mr. Ravnborg had founded the company in 2004, and ran it as a full-time President/CEO since its inception, and was aware of, and in control of, A4's day to day operations. Park Capital subsequently invested in A4, invested in new software (together with HelloBuild), helped develop a new business model, and subsequently sold A4 to Mbanq. Mr. Ravnborg was in charge of handling operations at A4 both before and after Mbanq's acquisition of A4.

46.     Mbanq clearly understood during the due diligence that the agreements with the clients of A4 were not long term (month-to-month), and Mbanq had the opportunity over four months after the signing of the LOI, to contact each of the clients (e.g. to arrange a phone call with each one) and to verify any details regarding their agreements with A4.

47.     Mbanq's due diligence was done, in part, through various emails and phone calls between Mbanq and Counter-Plaintiffs. Indeed, Mbanq had sufficient diligence to identify declining trends in the number of A4 clients, and revenue, since 2015 – as evidenced in Mr. Davis' email to Mr. Lounegov prior to the acquisition! Knowing all of these facts, Mbanq ultimately decided to proceed with its acquisition

of A4 from Counter-Plaintiffs for the $2,090,000 acquisition price and close on the transaction by signing the SPA, the Promissory Notes, and issuing shares to Park Capital and Mr. Ravnborg.

48.     Mbanq subsequently confirmed its obligations under the LOI through, among other things: (i) numerous email and WhatsApp communications which it directed to Counter-Plaintiffs; (ii) partial performance under the LOI including direct payments wired to Park Capital's bank account based on the schedule agreed in the LOI; (iii) providing the signed share certificate and confirming that it was valid and fully executed; (iv) executing the Promissory Notes which were later executed by the Counter-Plaintiffs and Mr. Ravnborg[14]; (vi) the SPA which was signed after all other consideration was provided; (v) Mbanq's partial payments under the Promissory Notes; and (iv) Mbanq's acknowledgement of its debt obligations to Counter-Plaintiffs, and promises to pay the debt in full, based on the Promissory Notes, provided on regular basis in writing and verbally between February 2019 and August 2020.

49.     The LOI also provided several non-essential terms including, among other things, that in addition to Mbanq's purchase of A4, Mr. Lopatine would be offered a position on the Mbanq advisory board to assist in developing plans and strategy for Mbanq, introduce Mbanq to industry experts, bankers, and potential investors, identify key personnel and experts, and provide other services that Mbanq may need.[15] Despite the fact that Mr. Lopatine performed (including ten (10) days of meetings in person in New York and Miami) and exchanged hundreds of emails and messages, consisting of over 300 hours of consulting directly to Mr. Lounegov and Mr. Valverde, Mbanq failed to provide any compensation to Mr. Lopatine for these services. This includes work by Mr. Lopatine to identify industry experts, participate in industry conferences, introductions to key personnel and potential clients, and other consulting work, valued at approximately $100,000 in damages due and outstanding to Mr. Lopatine.

---

[14] As well as Solutions Capital (a debt-collection company which Mr. Lopatine provided in the event that Mbanq defaults under the Promissory Note).

[15] For example, Mr. Lopatine introduced Mbanq to David Richards, who previously worked for Lopatine at Nymbus. Mbanq hired Mr. Richards as its Chief Revenue Officer based on his decades of relevant experience in the industry. Mr. Lopatine also participated in-person in the Future of Fintech Conference for Mbanq, and arranged Mbanq's Bank Director to be able to join in the conference. Mr. Lopatine also facilitated introductions to influencers in Mbanq's industry, such as Ziad Abdelnour, the head of the Financial Policy Council. Mr. Lopatine introduced Mbanq to over fifty (50) potential investors, and numerous potential clients.

---

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM                    Case No. 3:21-cv-6396-AGT

50.    The LOI provided that Mbanq would purchase 100% of A4, including all of A4's intellectual property, existing clients, and receivables. Mr. Ravnborg and his wife, Juliana, would stay engaged with the company, as employees for Mbanq. In exchange for Park Capital's 95.3% share of A4, Mbanq agreed to pay Park Capital a cash sum (the "Purchase Price") and issue 1.50% of Mbanq's shares (150,000 shares) to Park Capital, with a put option to sell the shares back to Mbanq at $6.90 per share twelve (12) months after the LOI. This payment was in addition to, and separate from, Mr. Lopatine's compensation as an advisory board member as referenced in the LOI. In addition to that Mr. Ravnborg would be transferred $50,000 worth of Mbanq shares, and $35,000 under the Promissory Note.

51.    In April 2019, after the parties entered into the LOI, Mbanq offered to hire Mr. Lopatine as Head of Americas of Mbanq for at least one year. Mr. Lopatine accepted the offer and negotiated the final draft on July 2, 2019. Mr. Lounegov accepted that fact, in writing by confirming that Mr. Lopatine did not need to sign the non-compete agreement or to assign the Intellectual Property as part of the agreement (the "Head of Americas Agreement"). Mbanq then publicly announced Mr. Lopatine's position as "Head of Americas" in various press articles to attract investors. Mr. Lounegov also agreed in writing that the $1,055,000 cash payment as part of the A4 acquisition is separate from the Head of Americas Agreement, which would survive whether or not the Head of Americas Agreement would be performed. Mr. Lounegov falsely represented that Mr. Lopatine would be hired for $96,000 yearly fee beginning in September, which was on top of, and completely separate from the cash portion of acquisition fee of $1,055,000 for Mbanq's purchase of A4. This was now clearly part of Mbanq's efforts to fraudulently induce Counter-Plaintiffs to cooperate and perform the Agreements which they did. There were *no additional shares* to be provided under the Head of Americas Agreement. Ultimately, Mr. Lounegov failed to send the final draft of the Head of Americas Agreement. In December, Mr. Lopatine advised Mr. Lounegov that he no longer wished to work for Mbanq. On February 24, 2020, Mr. Lopatine also advised Mr. Lounegov that Mr. Lopatine rejected Mbanq's offer to be a sales agent (e.g. market in exchange for a commission) for Mbanq under the Head of Americas Agreement, or otherwise.

52.    However, Mbanq failed to execute the Head of Americas Agreement, failed to make any payments to Mr. Lopatine under the Head of Americas Agreement, and failed to include Mr. Lopatine in any of the Mbanq company meetings, or to otherwise engage Mr. Lopatine as agreed. Nevertheless,

it was clear for all parties, including Mbanq, that the acquisition of A4 was completely separate from the Head of Americas Agreement. Indeed, after acquiring A4, Mbanq continued to operate A4 in the U.S. with a substantial client base of U.S. credit unions, and staff such as Mr. Richards, and Mr. Ravnborg, which Mbanq retained as a result of the A4 transaction.

53.    In January 2020, Mr. Lounegov and Mr. Lopatine agreed in writing that the Head of Americas Agreement was "off the table" – meaning that it would not go forward. Thereafter, Mr. Lounegov continued to pay Park Capital, on behalf of Mbanq, for the acquisition of A4, based on the Promissory Notes and the invoices which were submitted by Park Capital to Mbanq. Mbanq continued making these partial payments based on invoices issued pursuant to the Promissory Notes until August 2020, which payments evidence and confirm, among other things, the A4 acquisition and payments for Mbanq's purchase of A4 were ***not*** contingent upon the signing or negotiating of any consulting agreement.

54.    In June and early July of 2019, the parties finalized all documents to finalize and close the sale of A4 (which were not related to the Head of Americas Agreement).

55.    One of the elements required for the closing to proceed was Mbanq's issuance of shares to Park Capital and Mr. Ravnborg. Indeed, although the parties exchanged several emails prior (including one email where Mr. Lounegov used the word "draft" out of context) on July 1, 2019 (*see* Exhibit "D" to the Complaint), Mbanq did indeed issue the shares on July 9, 2019 to Mr. Ravnborg and Park Capital by separate emails. The share certificate was not indicated as a "draft." On the contrary, Mbanq confirmed several times that the shares were actually issued, and asked Mr. Lopatine to execute the SPA and Promissory Notes based on the fact that the shares were actually issued.

56.    Similarly, another element required for the closing to proceed and for Counter-Plaintiffs and Mr. Ravnborg to sign the SPA, was for Mbanq to agree to the Promissory Notes. For example, on July 9, 2019, Mr. Lopatine and Mr. Lounegov exchanged several emails where Mr. Lopatine asked whether Mbanq's obligations would be reflected in an "appendix" and Mr. Lounegov advised on July 10, 2019 by email "Alex, I'm producing a supplemental agreement and will send it to you shortly – that works better than Appendix." Subsequently, Mr. Lounegov sent Mr. Lopatine the two signed Promissory

Notes, and repeatedly asked Mr. Lopatine to sign the SPA, assuring him that the share certificate from Mbanq, and the Promissory Notes, were validly issued, fully executed, and binding.

## B.    MBANQ CONDUCTS DUE DILIGENCE

57.    As discussed above, Mbanq performed its due diligence on A4 before acquiring it from the Counter-Plaintiffs. Mbanq knew the value of A4, including the value of A4's U.S. client base, the value of the intellectual property, and other assets of the business.

58.    Mbanq was aware of the profitability and financials of A4 and decided to proceed when it executed the LOI, the SPA, and the Promissory Notes. In particular, Mbanq reviewed and analyzed, among other things, A4's: (i) annual statements; (ii) bylaws; (iii) capitalization table; (iv) revenues; (v) products; (vi) monthly trial balances; (vii) financial statements for 2017 through 2019; (viii) month-to-month customer contracts; (ix) vendor, and employment contracts; (x) liabilities (including but not limited to debts owed to Park Capital and HelloBuild); and (xi) the current state of the software[16] and the work Mbanq would need to complete to satisfy A4's clients' needs post acquisition.

59.    On June 11, 2019, Mr. Davis, had initially suggested to modify the agreed-upon terms, based on his concerns regarding the valuation of A4. In particular, Mr. Davis advised that he was aware that the operating budget of A4 for the 2019 fiscal year forecast $60,000 of revenue and a loss of $46,000, as well as A4's declining trend in the number of active clients, revenue, and cash flow. A true and correct copy of the email is attached hereto as **Exhibit "D."**

60.    In addition, as part of Mbanq's due diligence, Mr. Davis recognized that if A4 were to hire additional employees, A4 would be in a *net loss* position of approximately $400,000 for the 2019 fiscal year, and that Mbanq would need to fund A4, in order for the business to proceed. Mr. Davis advised that "A4 is not profitable and not near breakeven" but that based on "Mbanq's 2019 valuation multiple of 10X, A4 would be valued at ~$600K" despite its lack of profitability. *See id.*

61.    Mr. Davis recommended an "earn-out" to bridge the gap between Mr. Davis' $600,000 valuation and the $2.4 million already agreed upon by the parties in the LOI.

---

[16] Including both: (i) A4's legacy software, and (ii) the new software for A4 which was developed by HelloBuild and financed by Park Capital and HelloBuild.

62. Following this email, Mr. Lopatine spoke with Mr. Lounegov – face to face before the Future of Fintech Conference that the two were attending together in New York City – and Mr. Lopatine refused the earn out. Mr. Lounegov and Mr. Lopatine then confirmed once again the agreement to proceed on the terms that agreed in the LOI – *without changes*. Indeed, the parties ultimately signed the SPA and the Promissory Notes (as set forth below), which unambiguously required payment of the full amount of the cash payment outstanding within twenty-four (24) months as set forth in the LOI. In addition, Mbanq's obligation to comply with the Put Option within twelve (12) months, upon demand, was not modified by the parties.

## C.   MBANQ ISSUES STOCK TO PARK CAPITAL

63. Prior to delivering the stock certificate to Park Capital[17], on July 1, 2019, Mr. Lounegov sent an email to Mr. Lopatine advising that Mbanq would be sending $15,000 to Park Capital. Around that time, *Mr. Lounegov* also called Mr. Lopatine and advised him that Mbanq would be issuing shares *back-dated* to 2017. Mr. Lopatine advised Mr. Lounegov that the earliest he would agree to Mbanq issuing back-dated shares would be as of March 2018 – because that was approximately the time when they started negotiations regarding the purchase of the company.

64. Indeed, on July 1, 2019, Mr. Lounegov stated in an email to Mr. Lopatine: "we [Mbanq] propose to issue your share certificate dated around October, 2017."

65. Mr. Lopatine responded to Mr. Lounegov by email, asking "[h]ow can we sign the SPA in 2019, but issue the shares in 2017 or 2018?" and advised that it would *not be appropriate to back-date the shares as far back as 2017* because he was divorced in early 2018. If the shares were issued in July of 2019, why would Mr. Lopatine want to back-date the shares to make them a marital asset, at a time well before the transaction for the sale of A4? Not only did Mr. Lopatine not request to back-date the shares – to any point in time – but there is neither factual nor logical support for the argument that Mr. Lopatine wanted to backdate the Mbanq shares from 2019 to a prior date, to somehow benefit a divorce which occurred in early 2018.

---

[17] As confirmed by Mr. Lounegov to Mr. Lopatine on July 1, 2019, the number of shares which were ultimately issued included the 150,000 shares in connection with the A4 acquisition, as well as 20,000 shares for advisory services, and 36,232 additional shares because Mbanq did not have funds to pay for consulting services provided under the LOI.

---

66. On the contrary, Mr. Lopatine wanted to ensure that the transaction was properly documented and back-dating the shares to 2017 as Mr. Lounegov proposed would be wrong. Indeed, it appears that Mbanq's argument with respect to this falsity, in its Complaint, is: (i)a bad-faith attempt to harass Mr. Lopatine and to slander his name; and/or (ii) another aspect of Mbanq's fraud with respect to its obligation to provide valid shares to Counter-Plaintiffs and Mr. Ravnborg.

67. In response, Mr. Lounegov stated that "***the 2 dates do not need to match***" and confirmed that the shares would be issued dated March 9, 2018. *See* **Exhibit "E"** (emphasis added, highlighted). That day, Mr. Lounegov also confirmed that Mbanq would pay the additional $10,000 to Park Capital which was part of the obligations due and outstanding, stating "I know. You are on top of the list!" *See id.*

68. On July 1, 2019, Mr. Lounegov also sent Mr. Lopatine an email advising the calculation for the issuance of shares pursuant to the LOI was issued as follows: 150,000 shares for the partial payment for the A4 acquisition, 20,000 shares for consulting as an executive advisor to Mbanq, and 36,232 shares as additional compensation sign-up bonus as an executive advisor to Mbanq. *See* **Exhibit "F."**

69. In addition, on July 1, 2019, Mr. Lounegov sent Mr. Lopatine an email confirming that the obligations under the Promissory Notes, are independent of, and would survive the proposed "Head of America's" consulting agreement. *See* **Exhibit "G"** (highlighted).

70. On July 9, 2019, Mr. Lounegov sent Mr. Lopatine an email stating, in relevant part, "[i]n respect of your shares, we will issue you the share certificate dated March 9, 2018 . . . Pls confirm in which name you would like the shares – you or park or split between the 2 and Javier [Valverde] will issue the share certificate to you today." (emphasis added). There was no mention of it being a "draft" share certificate in Mr. Lounegov's July 9, 2019 email; on the contrary, this email confirmed that the share certificate was being issued by Mr. Valverde. *See* Exhibit "B."

71. On July 9, 2019, Mr. Valverde of Mbanq sent Mr. Lopatine an email stating "[p]lease find attached Park Capital Ventures, LLC Share Certificate" and asking Mr. Lopatine to check for errors, and assuring Mr. Lopatine that the certificate "denotes the fully vested number of shares allocated" to

Park Capital on Mbanq's "capitalization table." *See id.* (emphasis added).[18] There was no mention of it being a "draft" share certificate in Mr. Valverde's July 9, 2019 email; on the contrary, this email confirmed that the share certificate was not only issued by Mbanq, but that Park Capital's shareholding position was reflected on Mbanq's capitalization table.

72.    On July 10, 2019, after Mbanq delivered the share certificate to Park Capital, Mr. Lopatine asked Mr. Lounegov, by WhatsApp, whether Mbanq complied with its obligation to deliver Mbanq's share certificate to Mr. Ravnborg. Mr. Lounegov responded by providing a copy of the email sent from Mr. Valverde to Mr. Ravnborg providing the share certificate – which was virtually identical to the email which was sent to Mr. Lopatine conveying the share certificate to him. During the time, Mr. Lopatine and Mr. Lounegov were discussing the fact that the SPA was not yet signed, and that without the fully executed Promissory Notes, Counter-Plaintiffs would not sign the SPA.

73.    If the share certificate were never issued, and Mbanq never registered Park Capital's position on Mbanq's capitalization table, then these statements by Mr. Valverde and Mr. Lounegov were clearly false and fraudulent misrepresentations, intentionally made to induce Counter-Plaintiffs to transfer their interest in A4 to Mbanq under false pretenses.

74.    On July 10, 2019, Mr. Lounegov sent Mr. Lopatine two WhatsApp messages stating among other things: "**[w]e issued share certificates and signed agreement, as promised.** We can work on your consulting agreement separately. Let's not confuse the closing of A4 with the consulting agreement." (emphasis added). By these messages, Mr. Lounegov confirmed that the shares were in fact issued, and that the consulting agreement was separate from the purchase of A4. A true and correct copy of the messages is attached hereto as **Exhibit "H"** (emphasis added). Mr. Lopatine was led to believe that Mbanq had indeed issued a valid stock certificate to Park Capital.

75.    As set forth below, in order to execute the obligations in the LOI, Mbanq, Holdings, and Mr. Ravnborg entered into the SPA (dated June 28, 2019) for the sale of A4. As with the stock certificate, the SPA was back-dated *by Mbanq* – this time, it was backdated approximately two weeks from the

---

[18] On July 9, 2019, Mr. Valverde also sent Mr. Ravnborg an email providing Mr. Ravnborg with his stock certificate, in connection with his interest in Mbanq.

closing date. It is not clear why it was backdated by Mbanq, but it the SPA certainly was not executed on June 28, 2019 – indeed, Mbanq did not even receive the A4 Board's approval of the transaction until July 12, 2019.

76. Pursuant to the SPA, Holdings and Ravnborg agreed to sell all 107,204 shares (100%) of issued and outstanding common stock of A4 to Mbanq at the ***nominal*** price of $0.001 per share, for a nominal total of $107.41.

77. However, it was clear for all parties, including Mbanq, signing the SPA that the nominal share price was contingent upon, *inter alia*: (i) Mbanq delivering validly issued share certificates to Mr. Ravnborg and Park Capital; (ii) the parties' signing both Promissory Notes denoting the cash amount due for Mbanq's purchase of A4 (less $100,000 in payments Mbanq already made toward the acquisition of A4 pursuant to the LOI), totaling $1,055,000; (iii) delivering Mr. Ravnborg his signed employment agreement; and (iv) agreeing on the final draft of the SPA between all parties, including Mbanq, Park Capital, HelloBuild, and Mr. Ravnborg.

78. It was clear for all parties, including Mbanq, that the nominal prices of $107.41 was ***not*** the sale price for A4, and that all material terms of the A4 transaction were outlined in the LOI, which became a valid contract after: (i) Mbanq made several large payments, totaling $100,000 and issued shares to Park Capital and Mr. Ravnborg, thus partially performing under the contract; (ii) Counter-Plaintiffs relied upon the LOI; and (iii) the parties subsequently confirmed the terms of the LOI in subsequent emails, WhatsApp communications, and within the terms of the Promissory Notes and the SPA. Indeed, Mr. Lounegov himself acknowledged that Mbanq paid $100,000 under the LOI and calculated the total remaining amounts under the Promissory Notes after considering the amounts paid under the LOI.

79. The nominal amount in the SPA was contingent on ensuring that the Promissory Notes would be executed contemporaneously – which they were – and which secured additional payments to Counter-Plaintiffs to be made, as well as the stock certificate to be provided, together with the option to buy back the shares, all of which was originally set forth in the LOI as the purchase consideration for the sale of A4 to Mbanq.

80. Simultaneously with the execution of the SPA, Park Capital, and Mbanq proceeded to execute two Promissory Notes ("Promissory Note 1" and "Promissory Note 2"). True and correct copies of the fully executed Promissory Notes are attached hereto as **Exhibit "I."**

81. Pursuant to Promissory Note 1, Mbanq agreed to pay Ventures[19] the sum of $831,549.00 in monthly installments of $25,000.00. However, if Mbanq received $4,000,000.00 or more in a funding round, achieved $4,000,000.00 in cash flow, or twenty-four (24) months from closing passed, Mbanq was required to pay the full outstanding amount. *See id.*

82. Pursuant to Promissory Note 2, Mbanq agreed to, among other things, pay HelloBuild the sum of $188,496.00 and Holdings the sum of $83,000.00 whenever Mbanq received $4,000,000.00 or more in a funding round or Mbanq achieved $4,000,000.00 in cash flow, whichever occurred earlier. *See id.*

83. The $83,000 debt to Park Capital (under Promissory Note 2) was based on the $72,000 which Park Capital transferred to A4 as a loan. A4 paid these funds to HelloBuild in connection with software which was developed for A4. Indeed Mr. Ravnborg made the first payment to HelloBuild from these funds (which had been loaned from Park Capital). In addition, Park Capital loaned another $11,000 to A4 to pay for accumulated losses. These payments totaled $83,000 which were due to Park Capital under Promissory Note 2, as the parties agreed when they signed Promissory Note 2.

84. The $188,496.00 amount was based on the amounts due to HelloBuild for software development services which HelloBuild performed for A4 (collectively referred to as the "Code"), which were invoiced to A4, and which were outstanding at the time when Mbanq purchased A4. Mbanq received a copy of the Code for due diligence purposes directly from Mr. Alava at HelloBuild, and Mbanq received the Code at the closing on the A4 purchase.

85. In order to compensate HelloBuild for the outstanding amounts due from A4, Mbanq proposed to execute a promissory note to pay HelloBuild. Indeed, Mr. Lounegov sent Mr. Lopatine a

---

[19] Promissory Note 1 mentions an agreement to pay "Park Capital Ventures and Solution Capital HK" however the parties included "Solution Capital HK" just as an alternative company affiliated with Lopatine and Park Capital, in the event that it would have been easier to transfer the funds to a Hong Kong company, which were at all times due to Lopatine and Park Capital. However, Solution Capital HK was not a party to the Agreements, and did not provide any consideration to Mbanq.

message stating, in relevant part: "[w]e are in full and violent agreement, brother! Here's what I propose: . . . We strike a separate agreement (or a note) between A4 an Mbanq company and HelloBuild, whereby A4 pays 180k in after we have raised 4m in consideration for the development efforts . . . this way we will not need to confuse the share purchase agreement with the debt . . . do you think that would be acceptable?" Mr. Lopatine responded: "We could do that . . . " A true and correct copy of the messages is attached hereto as **Exhibit "J."** This was also discussed in the LOI, and ultimately Mbanq confirmed its agreement to pay HelloBuild under the Promissory Notes it executed in connection with the SPA. *See* Exhibit "I."

86.     Indeed, Mbanq, Holdings, and HelloBuild signed Promissory Note 2 which required, *inter alia*, for Mbanq to pay $188,496 to HelloBuild and $83,000 to Holdings. These amounts were part of the $1,055,000 cash-portion amount agreed-upon in the LOI. The precise payment structure for the purchase of A4 was agreed upon by the parties and divided as set forth in the relevant documents comprising the Agreements (the LOI, SPA, Promissory Note 1, and Promissory Note 2).

87.     While Mbanq attempts to argue that the SPA was issued independently of all other agreements, this is belied by the documents themselves – both Promissory Notes reference the SPA – and it is also belied by the communications between the parties, confirming that all of the Agreements form part of one transaction: the sale of A4 to Mbanq for $2,090,000. All of those agreements were negotiated, agreed, finalized, and signed at the same time/day by each party to those agreements, as a package. None of the agreements exist independently of one another.

88.     On July 12, 2019, Mr. Ravnborg indicated that he was satisfied with the draft SPA and the Promissory Notes. As a result, A4 provided the consent of the Board of A4 in connection with the sale of A4 to Mbanq.

89.     Relying on Mbanq's false misrepresentations, statements, and promises, the issued stock certificates, and the terms of the agreement set forth in the LOI, Mr. Lopatine signed the SPA and both of the Promissory Notes (which referenced the SPA) on July 12, 2019.

90.     On July 13, 2019, Mr. Alava signed the Promissory Note, which required Mbanq to pay HelloBuild $188,496. At the time, Mr. Alava was holding the code to the A4 software and HelloBuild had invoiced A4 $188,496 at that time. After the closing of the A4 transaction with Mbanq, HelloBuild

provided the code to Mbanq with the agreement that Mbanq would pay HelloBuild $188,496 as provided in the signed Promissory Note. Mbanq never paid HelloBuild the $188,496 amount as promised under the Promissory Note, and now having received the benefit of the Code from HelloBuild, is Mbanq is arguing that the Promissory Note is invalid.

91.    The SPA, and the Promissory Note was signed by Mr. Ravnborg on July 14, 2019. confirming the debt to him, and on that date,  he also signed his employment agreement with A4. *See* **Exhibit "K."**

D.    **MBANQ BREACHES THE AGREEMENTS**

92.    In April 2019, Mbanq paid the $50,000.00 initial payment required pursuant to the LOI and Promissory Note 1 in two (late) installments—a $20,000.00 payment on April 4, 2019, and a $30,000.00 payment on April 9, 2019.

93.    In May 2019, Mr. Lopatine began to introduce Mbanq to investors as agreed. *See, e.g.,* **Exhibit "L"** for a true and correct copy of WhatsApp messages sent on May 19, 2019 from Mr. Lopatine to Mr. Lounegov listing potential investors that Mr. Lopatine thereafter introduced to Mbanq.  Moreover, there are numerous emails communications evidencing the introductions to investors, which are not attached here, for brevity.

94.    After executing the LOI, Mbanq made several $25,000.00 monthly payments. However, Mbanq did not make full $25,000.00 payments, did not make the payments on time, and started paying amounts less than the total amounts due each month, in direct breach of the parties' agreement.

95.    On July 2, 2019, American Banker published an article that "Alexander Lopatine, the founder of Nymbus, has been named executive adviser and head of the Americas for San Francisco-based Mbanq, which simultaneously announced that it has bought the online and mobile banking platform AgilityFour. The price was not disclosed. . . . Mbanq purchased AgilityFour from Park Capital . . . It now plans to open an office and fintech accelerator in Miami as part of an effort to ramp up U.S. operations." *See* **Exhibit "M."**

96.    On May 7, 2020, Mr. Lopatine also introduced Mr. Lounegov to an immigration attorney, in connection with Mr. Lounegov's obtaining a work visa for his position as CEO of Mbanq. It is not clear whether Mr. Lounegov ever obtained a visa for his CEO position at Mbanq.

97. As of August 2020, based on the information that Mr. Lounegov provided to Mr. Lopatine, Mr. Lounegov did not have a valid immigration status to work as CEO of Mbanq in the US. He was apparently in the United States based on an H1B visa issued for him to work as a financial analyst at the vineyard of Mr. Reynoso, the Chairman of Mbanq.

98. It appears Mr. Lounegov did not have a valid immigration status to work as the CEO of Mbanq. This was known by Mbanq, including Mr. Lounegov and Mr. Reynoso and is a clear risk for all creditors and investors (including Counter-Plaintiffs) and is also evidence of yet another misrepresentation by the CEO of Mbanq – a company that induced Park Capital and Mr. Ravnborg to accept its shares (and option to buy-back) as partial payment for approximately 50% of the A4 acquisition, which was $1,035,000 to be paid in shares to Park Capital and $50,000 in shares to be paid to Mr. Ravnborg.

99. When Counter-Plaintiffs requested additional information regarding Mr. Lounegov's immigration status – with respect to his ability to work as the CEO of Mbanq – Mbanq failed and refused to provide any further information (or even confirmation that he was validly employed by Mbanq) to its shareholder Park Capital.

100. If Counter-Plaintiffs had known that Lounegov has no proper immigration status in the United States to work as the CEO of Mbanq, Counter-Plaintiffs never would have accepted Mbanq shares as partial payment for the A4 transaction, or entered into the A4 transaction in the first place.

101. Even after the SPA and the Promissory Notes were negotiated and signed, Mbanq continued to breach the LOI and Promissory Note 1 by failing to pay the full $25,000.00 installment payment to Park Capital. Instead, Mbanq sporadically paid small sums ranging from $1,000.00 to $15,000.00 via wire transfer, PayPal, and Venmo. A true and correct copy of Mr. Lopatine's email to Mr. Lounegov attaching the ledger evidencing all payments made by Mbanq, and as evidence of those amounts Mbanq still owed Counter-Plaintiffs as of the date of the email, is attached hereto as **Exhibit "N."** Counter-Plaintiffs fully performed their obligations under the LOI, the SPA, and the Promissory Notes.

102. The Agreements specified periods of time for repayment, and repayment was ***not based upon*** on Mr. Lopatine raising $4 million in funds (or any amount) for Mbanq or A4, but rather that

*Mbanq* was the party which was required to either raise $4 million in funds, achieve $4 million in free cash flow, *or* twenty-four (24) months had to pass following the execution of the Promissory Notes, at which point, Mbanq would need to repay the full amounts due and owing to Counter-Plaintiffs.[20]

103.   The plain language of the Promissory Notes and the LOI provide the circumstances pursuant to which Mbanq was required to make payment, and certain circumstances when all of the payment due would be accelerated – for example, if Mbanq raised $4 million in funding, or achieved free cash flow of $4 million, then Counter-Plaintiffs would be repaid in full *before* the ultimate twenty-four (24) month period.

104.   Counter-Plaintiffs repeatedly asked for information regarding Mbanq's funding and cash flow, but were ignored and rebuffed at every attempt. Indeed, even though the twenty-four (24) month deadline has now lapsed, Mbanq failed to the make payments due and owing to Counter-Plaintiffs, as set forth below in greater detail.

105.   During this time, Mr. Lopatine, on behalf of Park Capital, communicated weekly with Mr. Lounegov, as representative of Mbanq, verbally and in writing, to inform Mbanq of its breaches of the LOI, and Promissory Note 1, and to repeatedly request payment of all outstanding sums that Mbanq owed Park Capital.[21]

106.   Although Mr. Lopatine introduced Mbanq to approximately 50 Fintech investors, each of those investors (mostly U.S. investors) passed on investing in Mbanq for the same objective reasons: (i) Mbanq's team was scattered across the world in places like Croatia, and included mostly freelancers and outsourced developers in different time zones (such as Cambodia); (ii) Mbanq had significant debt on its books; (iii) Mbanq's CEO had insufficient prior relevant experience in running a similar type of business; (iv) Mbanq's software was mainly legacy software acquired through an acquisition in Eastern

[20] Mr. Lopatine did agree, under the LOI, to make friendly introductions to investors, assist with the deck compilation, and attending capital-raising meetings, which he did perform (to the extent Mbanq permitted him to do so). For example, Mr. Lopatine introduced Mbanq to 40-50 Fintech investors, personally, including investors at the Future of Fintech Conference in New York City.

[21] In a good-faith effort to resolve all outstanding payments owed to Park Capital, Park Capital even attempted to negotiate a perpetual license of one of Mbanq's products to satisfy a portion of the debt that Mbanq owed to Park Capital. Ultimately, these negotiations were fruitless and Mbanq and Park Capital were unable to reach an agreement.

Europe, not SaaS as Mbanq represented; (v) Mbanq was not transparent in due diligence and failed to provide complete historical information regarding its numbers; (v) Mbanq was usually not sufficiently responsive in their communications with investors; and (vi) Mbanq's company valuation was significantly inflated and overvalued.

107.    Mr. Lounegov provided multiple excuses and extended repeated promises that Mbanq would pay its obligations under the Agreements.

**E.    COUNTER-PLAINTIFFS PROVIDE MULTIPLE OPPORTUNITIES BUT MBANQ FAILED AND REFUSED TO CURE ITS DEFAULTS UNDER THE AGREEMENTS**

108.    On July 22, 2019, Mr. Lopatine sent Mr. Lounegov a reminder that he had sent the $25,000 monthly invoice for July, under the Promissory Notes, and that payment was due. Mr. Lounegov responded: "Hi Alex, I cannot make any payment today. Hoping to resolve all outstanding issues by Wednesday. I'm trying my best you know that . . . "

109.    On July 30, 2019, Mr. Lounegov sent Mr. Lopatine a WhatsApp message while discussing Mbanq's obligations to pay Park Capital under the Promissory Notes. Mr. Lounegov's message stated: "I feel positive energy . . . I'm truly disgusted with the situation myself. I will rectify it at all costs . . . You have my word." Mr. Lopatine responded to this message by asking that the "next 25K August payment – please make it ASAP – ideally this week . . ." and Mr. Lounegov responded "I will do my best. You have my word." (emphasis added).

110.    On August 6, 2019, Mr. Lounegov sent Mr. Lopatine a WhatsApp message, advising, in relevant part, "[t]hese are my thoughts: (1) the balance of $25k for July – any day . . . I'm aiming to deliver it on or around your birthday." *See* **Exhibit "O"** (emphasis added).

111.    When Mr. Lopatine asked Mr. Lounegov when Mbanq would make the $25,000 payment on or about August 7, 2019, Mr. Lounegov responded "I respect the agreement I just don't have any money right this moment. Doing everything I can . . . Looking into Venmo now." *Id.* (emphasis added). *See* **Exhibit "P."**

112.    Each month, Mr. Lounegov would confirm that the $25,000 monthly payment would be made, and repeatedly, Mbanq would make payment either by wire transfer, Venmo, or PayPal. Sometimes the transfers were for the full $25,000 amount, and sometimes they were partial payments.

113.    On August 19, 2019, Mr. Lopatine sent Mr. Lounegov and Mr. Valverde the August invoice, and advising Mbanq that the payment for the July invoice was thirty-two (32) days overdue, and was due immediately. *See* **Exhibit "Q."** On January 19, 2020, Mr. Lopatine and Mr. Lounegov exchanged several WhatsApp messages, where Mr. Lounegov represented to Mr. Lopatine "Your assumption about no sales no pipeline and no team is quite frankly insulting. We have all attributes and achieved a profitable 2019 over again." When Mr. Lopatine asks when Mbanq will "start paying real amounts then – at least the 25K a month that was guaranteed," Mr. Lounegov responds "Not this week. I'll confirm the situation on Tuesday." Mr. Lopatine asked "It's 100K outstanding as of today Vlad" and Mr. Lounegov responded "We don't have cashflow to make any payments this week. I will confirm on Tues the amount and date when to expect." *See* **Exhibit "R"** (emphasis added). Between August 2019 and August 2020, Mbanq continued paying amounts less than the monthly $25,000 invoices issued by Park Capital. Mr. Lopatine repeatedly attempted to get Mbanq to commit to paying the outstanding amounts overdue.

114.    In July-August 2020, counsel for Mr. Lopatine and Park Capital also attempted to resolve the outstanding payments due to Counter-Plaintiffs by Mbanq, and again made demands for Mbanq to make payments of the outstanding sums owed. For example, on September 3, 2020, counsel for Mr. Lopatine and Park Capital sent an email to Mr. Lounegov, proposing a structured payment plan to pay the outstanding sum of $228,603.00, which was the amount due at the time of the email. On September 14, 2020, Mr. Lopatine sent Mr. Lounegov an email attaching the September 2020 monthly invoice for $25,000 and advising, among other things: "$253,603.00 is due and outstanding today - based on the $25K a month agreed schedule (according to the signed promissory note). Please let me know when can we receive the outstanding payment of $253,603.00." A true and correct copy of the September 14, 2020 email is attached hereto as **Exhibit "S."**

115.    Furthermore, after counsel for Mr. Lopatine and Park Capital initially communicated with Mbanq in August 2020 and sent a litigation hold letter, Mbanq illegally deleted and cleared the contents of Mr. Lopatine's corporate Mbanq email address and after the Demand Letter, Mbanq deleted Mr. Lopatine's Mbanq corporate email account altogether. Over the next sixteen (16) months, Mr. Lopatine exchanged multiple emails, calls, and WhatsApp messages with Mr. Lounegov and others at Mbanq, and

not once did Mbanq deny that Mbanq owed $25,000 per month under the Agreements. Mbanq's repeated responses were that they did not have sufficient money to pay, and were doing everything they can. Mbanq sent money by various means, including by Venmo and PayPal, to Mr. Lopatine, Ventures, and Holdings. Mbanq never paid HelloBuild.

116. Indeed, Park Capital, sent sixteen (16) monthly invoices to Mbanq, in the amount of $25,000 per month (and with the first invoice in the amount of $50,000), which were due and payable to Park Capital. The invoices confirmed that they were made "based on promissory note" and were made for the consulting/advisory services which were provided to Mbanq as part of the sale of the A4 business sold to Mbanq. True and correct copies of several of these invoices and related emails are attached hereto as **Exhibit "T."**

117. However, despite the Counter-Plaintiffs' full performance of their obligations under the Agreements, in response to the September 3, 2020 email, Mr. Lounegov stated, for the first time, that Mbanq did not owe any sum of money to Park Capital and stopped making payments all together, in further breach of the Agreements.

118. Due to Mbanq's breach, on September 22, 2020, Park Capital sent a demand letter ("Demand Letter"), to Mbanq demanding to inspect and copy certain books and records of Mbanq pursuant to 8 Del. C. § 220. The purpose of the Demand Letter was to, among other things: (1) ensure that Park Capital's shares in Mbanq were properly recorded in its books and records and reflected the value Mbanq represented to Park Capital; (2) ensure that Mbanq's debt obligation to Park Capital was properly recorded in its books and records; (3) confirm Mbanq was able to pay down the debt owed to Park Capital; (4) confirm the value of the Mbanq software platforms; (5) determine whether Mbanq's officers and/or shareholders have properly discharged their fiduciary duties to Park Capital; (6) investigate whether Mbanq accurately disclosed to its shareholders the dealings with Park Capital and debt that Mbanq still owes to Park Capital; (7) obtain information to determine whether Mbanq's officers and/or directors are independent and disinterested, and whether they have acted in good faith; and (8) take any appropriate action in the event that any wrongdoing is revealed. A true and correct copy of the Demand Letter is attached hereto as **Exhibit "U."**

119.    Park Capital's purpose for the Demand Letter was and is proper because it is reasonably related to its interests as a shareholder. Furthermore, in compliance with 8 Del. C. § 220, the Demand Letter was accompanied by a power of attorney authorizing counsel for Park Capital to make the demand.

120.    Mbanq did not respond to the Demand Letter until October 8, 2020, at which time Joe Reynoso ("Reynoso"), Mbanq's Chair of the Board of Directors, indicated for the first time after over a year of (partial) performance, that Park Capital was **not** reflected as a shareholder of Mbanq in any of Mbanq's records. In response, Park Capital provided proof of ownership of the shares of Mbanq, including the share certificate.

121.    On December 12, 2020, Mr. Lopatine sent two emails to Mbanq. True and correct copies of the December 12, 2020 emails are attached hereto as **Exhibit "V."** In the first email, Mr. Lopatine made a demand for the outstanding amount of $328,603.00 that was due by Mbanq pursuant to Promissory Note 1 as of that date. In the second email, Mr. Lopatine exercised the Put Option set forth in the LOI to sell Park Capital's 206,232 shares in Mbanq at $6.90 a share, for a total of $1,423,000.80. Mbanq did not respond to either email and failed to perform.

122.    Mbanq's failure to pay the outstanding amount owed to Park Capital and Mbanq's failure to honor the Put Option to buy Park Capital's shares in Mbanq at $6.90 a share – which could be exercised within twelve (12) months of the execution of the LOI – constitutes a material breach of the LOI and the Promissory Notes.

123.    During the negotiations of the LOI, the SPA, and the Promissory Notes, Mbanq represented to Park Capital that it had $2.5 million in revenue in 2018 and that it expected to have $6 million in revenue in 2019. Based on information presently available, Mbanq now has in excess of $4,000,000.00 in cash flow.

124.    In addition, there is no question of fact that more than twenty-four (24) months have passed since the closing of the transaction where Mbanq purchased A4 from the Counter-Plaintiffs. This was the deadline set in the LOI, and referenced in Promissory Note 1, for the repayment of the full cash amount of the Purchase Consideration in exchange for Mbanq's purchase of A4 from Counter-Plaintiffs.

125.    As a result, the full unpaid amount of the remaining amount of the Purchase Consideration totaling $621,152.00 under the LOI and Promissory Note 1 is currently due and owing to Park Capital.

Additionally, pursuant to the LOI and Promissory Note 2, the sum of $83,000.00 owed to Holdings, and the sum of $188,496.00 owed to HelloBuild are currently due and owing. Mbanq has also failed to honor the put option under the LOI.

**F.    MBANQ'S FRAUD AND MISREPRESENTATIONS**

126.    With specific intent to defraud, Mbanq, Mr. Lounegov, and Mr. Valverde, knowingly devised their scheme to defraud Counter-Plaintiffs, causing them to transfer their interest in A4 to Mbanq, fraudulently promising that Mbanq would pay Counter-Plaintiffs over time, in cash payments, as well as through stock issuance and the buy-back Put Option despite having the positive intent at the time of closing to never make the payments in full or issue the stock.

127.    There was never a real intention to actually pay Counter-Plaintiffs the full agreed-upon compensation. Instead, the Agreements were only executed by Mbanq to falsely induce Counter-Plaintiffs to sell their interest in A4 to Mbanq. Following its purchase of A4, Mbanq began telling clients and investors that Mbanq had purchased A4, and that Mr. Lopatine had joined Mbanq as Head of Americas – even though Mbanq never hired Mr. Lopatine for that role.

128.    Those representations were material to Counter-Plaintiffs and were falsely made and were made for the purpose and intent of inducing Counter-Plaintiffs to sell and transfer their interest in A4 to Mbanq. Mr. Lounegov, on behalf of Mbanq, made those false representations purposefully, knowing them to be false. As detailed herein, Mr. Lounegov, individually and on behalf of Mbanq, made false representations of material fact to Counter-Plaintiffs to the effect that if the Counter-Plaintiffs transferred their shares in A4 to Mbanq, then Mbanq would pay compensation to Counter-Plaintiffs over time.

129.    Mbanq accomplished this fraud through numerous meetings, through numerous phone calls, by e-mails and through wire payments in the United States, through sending an unregistered fraudulent stock certificate and then claiming it was only a "draft" (but only after receiving the benefit of the shares of A4), and issuing issuance of fraudulent unregistered securities – promissory notes, intending to defraud Counter-Plaintiffs by means of false or fraudulent pretenses.

130.    Indeed, Mr. Lounegov consistently promised that Mbanq was doing well after the A4 purchase and that Mbanq intends to pay. For example, Mr. Lounegov sent a WhatsApp message to Mr. Lopatine on January 19, 2020 stating, in relevant part: "<u>I'm really grateful for everything you've done</u> .

. . What this means exactly is that 2020 is going to be an amazing year for us. We're gearing up for an influx in deliveries, we are in the middle of operational restructuring, we have more opportunities we can possibly deliver. . . . " (emphasis added).

131. When Mr. Lopatine asked Mr. Lounegov when Mbanq would "start paying real amounts then – at least the 25K a month that was agreed" Mr. Lounegov responded "Not this week. I'll confirm the situation on Tuesday . . . You are not taken for granted. We have to level set expectations. And that is on Tuesday. Before that I cannot commit to any payment this week." Indeed, Mr. Lounegov never mentioned that the Agreements did not exist – of course they existed since: (i) the parties signed the Promissory Notes and the LOI, (ii) the Counter-Plaintiffs transferred their shares in A4 to Mbanq, (iii) Mbanq made several payments pursuant to the Agreements and promised further payments; (iv) the debts which are reflected in Promissory Notes are evidenced in the tax returns of A4; and (v) Mbanq agreed to pay the amounts due under the LOI and the Promissory Notes. The debts to Park Capital and HelloBuild cannot magically disappear from Mbanq's and A4's books just because Mbanq no longer wants to pay those obligations.

132. Counter-Plaintiffs have retained the law firm of Shutts & Bowen, LLP, and have incurred an obligation to pay their counsel their reasonable attorneys' fees and costs.

133. All conditions precedent to the maintenance of this action have been performed, have occurred or have been waived.

### COUNT I – BREACH OF CONTRACT – BREACH OF LOI

134. Counter-Plaintiffs reaffirm and reallege paragraphs 1-133 above as if fully set forth herein

135. On February, 21, 2019, Mbanq sent Mr. Lopatine a LOI establishing an agreement wherein Park Capital agreed to sell its interest in A4 to Mbanq.

136. The LOI provided that Mr. Lopatine would be offered a position on the Mbanq advisory board to assist in developing plans and strategy for Mbanq, introduce Mbanq to industry experts, bankers, and potential investors, identify key personnel and experts, and provide any other services that Mbanq may need. In exchange, Mbanq would issue 20,000 shares of Mbanq's common stock, representing .20% of Mbanq's shares, to Mr. Lopatine with a Put Option to sell the shares back to Mbanq at $6.90 a share.

137. The LOI also provided that in exchange for Park Capital's share of A4, Mbanq agreed to pay Park Capital the Purchase Price ($1,055,000) and issue 1.50% of Mbanq's shares to Park Capital, with a put option to sell the shares back to Mbanq at $6.90 a share twelve (12) months after the LOI.

138. Pursuant to the LOI, Mbanq was required to pay the Purchase Price as follows: (1) 50,000.00 to Park Capital, and (2) $25,000.00 payments to Park Capital in monthly installments until the Purchase Price was paid. However, if Mbanq received $4,000,000 or more in a funding round, or twenty-four (24) months from closing passed, Mbanq was required to pay the full outstanding Purchase Price.

139. In accordance with the LOI, Mbanq delivered a stock certificate issuing to Park Capital.

140. Counter-Plaintiffs have fully performed its obligations pursuant to the terms of the LOI.

141. Twenty-four (24) months from the closing of the LOI passed.

142. Mbanq has materially breached the LOI in many ways, including but not limited to the following: (1) failing to honor the put option to buy Park Capital's shares in Mbanq at $6.90 a share; (2) failing to pay Park Capital the $25,000 monthly payments as described in the LOI; and (3) failing to pay Park Capital the total outstanding amount of $621,152 when it obtained $4,000,000 in cash flow and within twenty-four (24) months as required.

143. As a direct and proximate result of Mbanq's material breaches of the LOI, Counter-Plaintiffs have suffered damages.

**WHEREFORE**, Counter-Plaintiffs, ALEXANDER LOPATINE, PARK CAPITAL HOLDINGS, LLC, PARK CAPITAL VENTURES, LLC, and HELLOBUILD, LLC demand judgment against Counter-Defendant, FINLINK, INC. d/b/a MBANQ, for damages, interest (including but not limited to applicable prejudgment interest), reasonable attorney's fees and costs, and for such other and further relief as this Court deems just and proper.

### COUNT II – BREACH OF CONTRACT – BREACH OF PROMISSORY NOTES

144. Counter-Plaintiffs reaffirm and reallege paragraphs 1-133 above as if fully set forth herein.

145. On June 28, 2019, Mbanq executed and delivered to Ventures **Promissory Note 1** in the amount of $831,549, representing the amount owed by Mbanq to Ventures.

146. Pursuant to Promissory Note 1, Mbanq was required to pay Ventures the sum of $831,549.00 in monthly installments of $25,000 until the $831,549 debt was fully paid.

147. However, if Mbanq received $4,000,000 or more in a funding round, achieved $4,000,000 in cash flow, or twenty-four (24) months from closing passed (whichever occurred earlier), Mbanq was required to pay the full outstanding amount to Ventures.

148. Ventures presently owns and holds Promissory Note 1.

149. Also, on June 28, 2019, Mbanq executed and delivered to HelloBuild and Holdings **Promissory Note 2**, representing $188,496.00 owed by Mbanq to HelloBuild and the $83,000.00 owed by Mbanq to Holdings.

150. Holdings and HelloBuild presently owns and holds Promissory Note 2.

151. Pursuant to Promissory Note 2, Mbanq was required to pay HelloBuild the sum of $188,496.00 and Holdings the sum of $83,000.00, upon the earliest of: Mbanq receiving $4,000,000.00 or more in a funding round; Mbanq achieving $4,000,000.00 in cash flow; or twenty-four (24) months after the execution of the Promissory Notes.

152. It is undisputed that twenty-four (24) months have passed after the execution of the Promissory Notes, and the total amounts payable by Mbanq to Counter-Plaintiffs are therefore currently overdue and outstanding.

153. Mbanq has failed to comply with the terms and conditions of the Promissory Notes by failing to: (1) pay Park Capital the $25,000.00 monthly payments as described in Promissory Note 1; (2) pay Park Capital the total outstanding amount of $621.152.00 when it obtained $4,000,000.00 in cash flow or twenty-four (24) months after the execution of the Promissory Notes; and (3) pay HelloBuild the sum of $188,496.00 and Holdings the sum of $83,000.00 when it obtained $4,000,000.00 in cash flow or twenty-four (24) months after the execution of the Promissory Notes. As a result, the Promissory Notes are in default and Mbanq has breached its obligations under the Promissory Notes.

154. As a direct and proximate result of Mbanq's material breaches of the Promissory Notes, Counter-Plaintiffs have suffered damages.

155. By reason of the foregoing default, Counter-Plaintiffs declare the full amount payable under the Promissory Notes to be immediately due and payable and hereby demand payment of all monies due and payable in accordance with the terms and provisions of the Promissory Notes.

156. The total amount of $621,152.00, plus interest, is due and owing to Park Capital under Promissory Note 1.

157. The total amount of $83,000.00, plus interest, is due and owing to Holdings under Promissory Note 2.

158. The total amount of $188,496.00, plus interest, is due and owing to Holdings under Promissory Note 2.

**WHEREFORE**, Counter-Plaintiffs, ALEXANDER LOPATINE, PARK CAPITAL HOLDINGS, LLC, PARK CAPITAL VENTURES, LLC, and HELLOBUILD, LLC demand judgment against Counter-Defendant, FINLINK, INC. d/b/a MBANQ, for damages, interest (including but not limited to applicable prejudgment interest), reasonable attorney's fees and costs, and for such other and further relief as this Court deems just and proper.

## COUNT III – PROMISSORY ESTOPPEL

159. Counter-Plaintiffs reaffirm and reallege paragraphs 1-133 above as if fully set forth herein.

160. Pursuant to the Agreements, including the LOI, the SPA, and the Promissory Notes, Mbanq represented and promised that in exchange for receiving full ownership of A4, Mbanq would, among other things: (1) pay Park Capital the $25,000.00 monthly payments when due, as described in Promissory Note 1 and the LOI; (2) pay Park Capital the total outstanding amount under Promissory Note 1 when it obtained $4,000,000.00 in cash flow or twenty-four (24) months after the execution; (3) pay HelloBuild the sum of $188,496.00 and Holdings the sum of $83,000.00 when it obtained $4,000,000.00 in cash flow or twenty-four (24) months after the execution; and (4) honor the Put Option to buy Park Capital's shares in Mbanq at $6.90 a share.

161. In justifiable reliance on Mbanq's promises, Counter-Plaintiffs transferred their ownership in A4 to Mbanq and faithfully and diligently provided services to Mbanq in connection with the acquisition of A4 to their detriment.

162. Mbanq has failed to, among other things: (1) pay Park Capital the $25,000.00 monthly payments as described in Promissory Note 1 and the LOI; (2) pay Park Capital the total outstanding amount under Promissory Note 1; (3) pay HelloBuild the sum of $188,496.00 and Holdings the sum of $83,000.00 due and owing; and (4) honor the Put Option to buy Park Capital's shares in Mbanq at $6.90 a share upon Park Capital exercising its Put Option.

163. It is undisputed that twenty-four (24) months have passed after the execution of the Promissory Notes, and the total amounts payable by Mbanq to Counter-Plaintiffs are therefore currently overdue and outstanding.

164. Injustice can only be avoided by enforcing Mbanq's promises.

**WHEREFORE**, Counter-Plaintiffs, ALEXANDER LOPATINE, PARK CAPITAL HOLDINGS, LLC, PARK CAPITAL VENTURES, LLC, and HELLOBUILD, LLC demand judgment against Counter-Defendant, FINLINK, INC. d/b/a MBANQ, for damages, interest (including but not limited to applicable prejudgment interest), and reasonable attorney's fees and costs, and for such other and further relief as this Court deems just and proper.

### COUNT IV – FRAUD

165. Counter-Plaintiffs reaffirm and reallege paragraphs 1-133, above as if fully set forth herein.

166. With specific intent to defraud, Mr. Lounegov on behalf of Mbanq, knowingly devised a scheme to defraud Mr. Lopatine and his companies Ventures and Holdings, as well as HelloBuild, causing them to sell their interest in A4 for illusory compensation, fraudulently promising that upon completing the sale and executing the Agreements, Mbanq would make payments, but never intending to ultimately make those payments. These promises were made, authorized, directed, approved, ratified, and/or adopted by Mbanq.

167. In particular, Mr. Lounegov on behalf of Mbanq, made certain promises and material misrepresentations, including but not limited to, promises that: (i) Mbanq would pay Counter-Plaintiffs the obligations when due under the Agreements; (ii) Mbanq executed the Promissory Notes in connection with the SPA; (iii) would honor the Put Option in the LOI; (iv) Mbanq would make payments under the Promissory Notes when due; and (v) Mbanq would issue real stock in the company to Park Capital

totaling 1.5% of the shares of Mbanq. At the time Mbanq made these promises, Mbanq did not intend to honor them.

168.    In addition, Mbanq represented that: (i) Mbanq was a profitable company with sufficient cash flow to make the required payments under the Agreements; (ii) Mbanq would complete the minimum viable product in order to provide the A4 software to its customers; (iii) the stock was in fact issued to Park Capital; (vi) the Promissory Notes are valid agreements; and (v) other representations made to induce Counter-Plaintiffs to transfer their interest in A4 to Mbanq. Many of the material misrepresentations are discussed above, together with specific dates regarding the "who, what, when, where, and how" of the fraud committed by Mbanq.

169.    Not only did Mbanq induce Counter-Plaintiffs to transfer their interest in A4, but Mbanq strung Counter-Plaintiffs along with false promises and representations of forthcoming payments, issuance of fraudulent unregistered securities (including fraudulent and unregistered stock certificates and promissory notes), because Mbanq wanted to reap the benefit of A4 and its client relationships in the United States, without having to pay for it.

170.    Counter-Defendant made the misrepresentations purposefully, knowing at the time it made the representations at issue that they were false and/or with the positive intent at the time of closing the transaction never to perform.

171.    Counter-Plaintiffs reasonably relied on Mbanq's misrepresentations and gave up their interest in A4 for: (i) illusory compensation, (ii) false promises, (iii) fraudulent unregistered securities (including fraudulent and unregistered stock certificates and promissory notes), and (iv) a false Put Option, in justifiable reliance on the representations made by Mbanq.

172.    Mbanq's intention was to induce Counter-Plaintiffs to enter into the Agreements, to obtain the Counter-Plaintiffs' shares and interest in A4, and to not pay the full amounts due and owing – by later claiming that, *inter alia*, there was no agreement and the executed stock certificate sent was just a "draft."

173.    Mr. Lounegov, on behalf of Mbanq, to further the scheme, and with intent to defraud, caused funds to be transmitted by wire, PayPal, and Venmo in the United States, including but not limited to the payments made in conjunction with Promissory Note 1 to Ventures, Holdings, and Mr. Lopatine,

and in conjunction with these payments, Mr. Lounegov communicated material false statements to Mr. Lopatine, by email and phone. Through these wire payments, emails and phone calls, Mbanq was able to fraudulently acquire shares in A4, by means of false and fraudulent pretenses.

174. Mr. Lopatine, Holdings, Ventures, and HelloBuild suffered damages as a direct, proximate, and reasonably foreseeable result of Mbanq's acts described above. As a result, Counter-Plaintiffs have been, and will continue to be, injured in an amount to be determined at trial.

**WHEREFORE**, Counter-Plaintiffs, ALEXANDER LOPATINE, PARK CAPITAL HOLDINGS, LLC, PARK CAPITAL VENTURES, LLC, and HELLOBUILD, LLC demand judgment against Counter-Defendant, FINLINK, INC. d/b/a MBANQ, for damages, interest (including but not limited to applicable prejudgment interest), reasonable attorney's fees and costs, and for such other and further relief as this Court deems just and proper.

## COUNT V – ACCOUNTING

175. Counter-Plaintiffs reaffirm and reallege paragraphs 1-133 above as if fully set forth herein.

176. In connection with the SPA, Mbanq represented that it was a profitable company with sufficient cash flow to make the required payments to Defendants under the Agreements. Indeed, as one of the elements of repayment to Counter-Plaintiffs under the Promissory Notes, Mbanq represented that it would make payment when Mbanq raised $4 million in funding, or achieved free cash flow of $4 million, or within twenty-four (24) months of closing of the transaction. In addition, Mbanq issued shares to Park Capital as part payment, and guaranteed that the shares would be repurchased at $6.90 per share within twelve (12) months of closing.

177. In these circumstances, Mbanq has a fiduciary duty and obligations to Counter-Plaintiffs. This includes but is not limited to: (i) Mbanq's obligations to Counter-Plaintiffs in connection with payment milestones under the Promissory Notes, as well as (ii) Mbanq's obligations to Park Capital as a shareholder in Mbanq. As a result of the aforesaid duties and obligations owed to Park Capital, Mbanq had an obligation to provide Park Capital with an accounting.

178. Park Capital does not have an adequate remedy, other than an equitable accounting, through which to gain for itself, a comprehensive understanding of the finances of Mbanq, including its

available cash flow, its revenue, and its financial wherewithal, all of which affect the value of Park Capital's shares, as well Mbanq's repayment obligations to Counter-Plaintiffs under the Agreements.

**WHEREFORE**, Counter-Plaintiff, PARK CAPITAL VENTURES, LLC, respectfully requests that this Court enter an Order compelling Counter-Defendant, FINLINK, INC. d/b/a MBANQ to render a full and complete accounting of the finances of Mbanq as they relate to Park Capital's shares, and the amounts Mbanq has raised in funding from the closing of the transaction to the present, and Mbanq's cash flow (to determine whether and when either of these amounts reached $4 million or above), and for such further relief as this Court deems just and necessary.

## COUNT VI – UNJUST ENRICHMENT

179.    Counter-Plaintiffs reaffirm and reallege paragraphs 1-133, above as if fully set forth herein.

180.    Mbanq has been unjustly enriched as a direct result of: (i) Counter-Plaintiffs' sale and transfer of all 107,204 shares of issued and outstanding common stock of A4 to Mbanq, and (ii) Mr. Lopatine providing consulting to Mbanq totaling approximately $100,000 in value.

181.    By making the transfer of their interest in A4 to Mbanq, Counter-Plaintiffs have conferred benefits, including but not limited to, A4's reputation and goodwill, the assistance of its founder, the existing clients of A4, as well as a revenue stream, and intellectual property, which Mbanq received. In addition, Mr. Lopatine provided consulting services to Mbanq (including setting up meetings with potential investors), which Mbanq did not pay for.

182.    Mbanq knowingly appreciated, accepted, and retained such benefits.

183.    Mbanq has not fully paid Counter-Plaintiffs for such benefits and Counter-Plaintiffs have been impoverished as a result thereof.

184.    There is no justification for Mbanq's enrichment or Counter-Plaintiffs' impoverishment, and under the circumstances, it would be inequitable for Mbanq to retain such benefits without paying the value thereof.

185.    To the extent that the contracts are not enforceable, Counter-Plaintiffs have no adequate remedy at law.

**WHEREFORE**, Counter-Plaintiffs, ALEXANDER LOPATINE, PARK CAPITAL HOLDINGS, LLC, PARK CAPITAL VENTURES, LLC, and HELLOBUILD, LLC demand judgment against Counter-Defendant, FINLINK, INC. d/b/a MBANQ, for damages, interest (including but not limited to applicable prejudgment interest), and reasonable attorney's fees and costs, and for such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Counter-Plaintiffs demand a trial by jury on all issues so triable as a matter of right.

Dated:  September 17, 2021                    AKIN GUMP STRAUSS HAUER & FELD LLP


By      */s/ Ashley Vinson Crawford*
                    Ashley Vinson Crawford
                    Stewart R. Gilson


SHUTTS & BOWEN LLP

Harold E. Patricoff (*pro hac vice pending*)
Aleksey Shtivelman (*pro hac vice pending*)
Isabella Llano (*pro hac vice pending*)

Attorneys for Defendants
Alexander Lopatine, Park Capital Holdings, LLC,
Park Capital Ventures LLC and HelloBuild, LLC